### SYNANON FOUNDATION, INC., Appellant,

v.

### Stuart A. BERNSTEIN, Samuel J. Kushner, James H. Kabler III, and Coldwell Banker and Company, Inc., Appellees.

No. 84–1635.

District of Columbia Court of Appeals.

Argued April 25, 1986.
Decided Nov. 4, 1986.

Sherman L. Cohn, Washington, D.C., for appellant.

William Daniel Sullivan, with whom Warren K. Kaplan, Washington, D.C., was on brief, for appellees Bernstein and Kushner.

John R. Cope, with whom Mary Caroline Parker, Washington, D.C., and Thomas R. Burns, Rochester, N.Y., were on brief, for appellee Coldwell Banker and Co., Inc.

Before PRYOR, Chief Judge, and MACK and BELSON, Associate Judges.

MACK, Associate Judge:

This appeal, we hope, marks the end of a carefully orchestrated attempt to subvert

the integrity of the judicial process. It comes to us from the award of $585,000 in attorneys' fees against Synanon Foundation for its bad faith litigation tactics. In an earlier appeal, *Synanon Foundation v. Bernstein*, 503 A.2d 1254 (D.C.1986) (*Synanon I*), cert. denied, —— U.S. ——, 107 S.Ct. 69, 93 L.Ed.2d 26 (1986), we upheld the pretrial dismissal of Synanon's complaint due to its perpetration of a massive fraud upon the court. There, we described Synanon's temporarily successful attempt to deceive the trial court and influence its decisions as "conduct which the administration of justice cannot tolerate." *Id.* at 1264. In this appeal, upon further review of that intolerable conduct, we conclude that Synanon richly deserved the additional sanction of an attorneys' fee award.[1]

 We are concerned, however, about the scale of the award. The trial court allowed the defendants all of their attorneys' fees for everything that occurred in this case. Although there is abundant proof that Synanon began litigating in bad faith soon after the proceedings were instituted, the record does not contain adequate evidence that the complaint was originally filed in bad faith. Consequently, in awarding attorneys' fees against Synanon for the entire litigation, the trial court included amounts which were not shown to be the result of Synanon's groundless, bad faith procedural moves. To the extent that fees unconnected to Synanon's bad faith litigation tactics were included, the trial court in effect added punitive damages to an otherwise proper bad faith fee award. Punitive damages may not be awarded un-der the guise of attorneys' fees. We reverse and remand for the trial court to reduce its award by any amounts in attorneys' fees which did not stem from Synanon's proven bad faith litigation tactics.[2]

I

Before the dismissal of Synanon's complaint, which we affirmed due to its fraud upon the court, Synanon was the plaintiff in an action arising out of an agreement to purchase an apartment house. The facts of the litigation are more fully set out in *Synanon I*. We recount them again here insofar as necessary to explain the basis of the attorneys' fee award against Synanon.

### THE BOSTON HOUSE DISPUTE

In 1958, Synanon was registered in California as a tax-exempt, nonprofit organization. Its avowed purposes were to rehabilitate drug and alcohol abusers and to engage in research, public education and charitable distribution. Two decades later, when the events giving rise to this litigation began, Synanon had become a highly controversial organization. National coverage, including a December 1977 story in TIME magazine, reported that Synanon had been transformed by its founder and leader, Charles Dederich, into a violent cult.

In April 1978, in search of a national headquarters and a residence for its members, Synanon approached appellee Coldwell Banker and Company, a real estate broker. One of Coldwell Banker's listings was the Boston House, 1711 Massachusetts

---

1. We stayed consideration of the present appeal pending the issuance of our decision in *Synanon I*.

2. This could be called the case of the migrant apostrophe. The proper location of the apostrophe in the term "attorney['][s]['] fee[s]" (and even whether it should be included at all) is a matter of heated controversy. The authorities support (1) "attorneys' fees," *e.g., Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); S. SPEISER, ATTORNEYS' FEES (1973); (2) "attorney's fees," *e.g., Fleischmann Corp. v. Maier Brewing Co.,* 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967); (3) "attorneys fees," Brief of Synanon; (4) "attorney's fee," *e.g., Toledo Scale Co. v. Computing Scale Co.,* 261 U.S. 399, 43 S.Ct. 458, 67 L.Ed. 719 (1923); and (5) "attorney fees," *e.g.,* Rowe, *The Legal Theory of Attorney Fee Shifting: A Critical Overview,* 1982 DUKE L.J. 651; *Attorney Fee Shifting,* 47 LAW & CONTEMP.PROBS. (1984) (symposium issue). Without purporting to resolve this thorny issue here, we place the superscript sign after the "s." Also, we use the term "attorneys' fees" to denote all reasonable litigation expenses, not just the payment of counsel.

Avenue, N.W., an apartment building owned by appellees Stuart Bernstein and Samuel Kushner. Appellee James Kabler, Coldwell Banker's sales agent, suggested that the Boston House would suit Synanon's purposes. An Agreement of Sale was signed on April 28, specifying a purchase price of $5,600,000. Synanon paid a down payment of $250,000, which Bernstein and Kushner were allowed to keep if Synanon defaulted on the purchase agreement, and Synanon was permitted to occupy two floors of the building pending settlement. It was the failure of the Boston House deal that led to the present dispute.

The Boston House Tenants' Association opposed the sale. Together with an Advisory Neighborhood Council, it lobbied the District of Columbia Zoning Commission to change the zoning laws, so that Synanon would no longer have an automatic right to convert some of the existing apartment units into offices for nonprofit use. Their lobbying succeeded. That same week, an evening TV news show ran a four-part series on the cult aspects of Synanon and its proclivity for violence.

By mid-June, Synanon was facing ever-increasing problems with the purchase. All in the one day, three critical events occurred. First, the Chief of Zoning Inspection informed Synanon that conversion of the building to office use would require a special exception under a recent emergency order. Second, Bernstein notified Synanon that he was treating allegations of harassment, made by the original Boston House residents against their new Synanon neighbors, as a breach of the Agreement of Sale. And, third, Kabler, Coldwell Banker's sales agent, revealed to Synanon that the floor load capacity of the Boston House might not be sufficient to meet the minimum requirements for office use under the District's building code. Kabler had apparently known this when he suggested the Boston House to Synanon, because another potential purchaser had withdrawn his interest about a week previously when Coldwell Banker, at the potential purchaser's request, obtained an unfavorable floor load capacity report from a building inspector. Armed with this information, Kabler allegedly attended three meetings with Synanon representatives, before the purchase agreement was signed, without disclosing the possible floor load capacity problem. On June 17 or 18, Synanon decided to move out.

At that point, Synanon insisted that the obligation was on Bernstein and Kushner to do whatever was needed to render the building suitable for office use. Bernstein and Kushner put that onus on Synanon. Eventually, a structural engineer reported that the building code would not permit the Boston House to be used for offices. On July 6, Bernstein and Kushner declared Synanon in default under the Agreement of Sale; the next day, Synanon made the same accusation against Bernstein and Kushner.

### THE LITIGATION

A week later, on July 14, 1978, Synanon filed its action for fraud, breach of contract, and breach of warranty. The defendants were Bernstein and Kushner, the owners of the Boston House, Coldwell Banker, their real estate broker, and Kabler, Coldwell Banker's sales agent. Synanon alleged that, when the Agreement of Sale was signed, the sellers and their agents knew that the Boston House was unsuitable for office use, and that Synanon had relied to its detriment upon their representations. The complaint sought rescission of the contract, return of the $250,000 down payment, compensatory damages for money spent converting the Boston House to offices, and punitive damages for fraud.

Bernstein and Kushner jointly denied Synanon's allegations. They also filed a counterclaim demanding damages for Synanon's alleged breach of various provisions of the Agreement of Sale. On December 12, after more publicity concerning Synanon's violent nature, Bernstein and Kushner amended their counterclaim to add the charge that Synanon had fraudulently pro-

cured the Agreement of Sale by concealing the fact that it was an organization committed to violence. Coldwell Banker and its sales agent, Kabler, also denied Synanon's allegations, but did not counterclaim.

On October 12, 1983, after five years of litigation, the trial court dismissed Synanon's complaint on the twin grounds that Synanon had perpetrated a fraud on the court and that it had engaged in discovery abuse prejudicial to the defense case. In *Synanon I,* we upheld the dismissal on the former ground without reaching the latter. 503 A.2d at 1255, 1262–64. Bernstein and Kushner's counterclaim was unaffected by the dismissal order.

In dismissing Synanon's complaint, the trial court ruled that the defendants would receive attorneys' fees, but specified no amount. Accordingly, appellees Bernstein and Kushner, jointly, and Coldwell Banker filed itemized requests for their attorneys' fees, expenses and costs arising out of the Boston House litigation. An evidentiary hearing on the attorneys' fees issue began on September 4 and ended on September 11, 1984. In its Findings of Fact and Conclusions of Law dated November 9, 1984, the trial court concluded that

> the all-pervasive nature of Synanon's fraudulent conduct (consisting of the destruction of massive amounts of significant evidence sought in discovery and the cover-up of that fraud by perjury and subornation of perjury), was directed and participated in by Synanon's executive and law departments, including Phillip Bourdette, its chief counsel and counsel of record in [the trial court]. This fraud upon the court is of the most serious nature and warrants the fullest sanctions. [Citations omitted.] Moreover, Synanon indelibly branded its complaint papers with bad faith when, after its hands were soiled with destroying evidence and perjury, it cynically (but successfully) moved on December 8, 1982, to amend its complaint by *increasing* its damages substantially. Accordingly, the court reaffirms its prior ruling [of Octo-

ber 12, 1983, contained in the order dismissing Synanon's complaint] that defendants shall recover all of their reasonable attorney's fees and expenses incurred during the six-year litigation of this action.

*Id.* at 2 (emphasis in original).

The trial court held that the appropriate measure for the recovery of fees and expenses in this case should be the amount of attorneys' fees and expenses actually and reasonably incurred by the defendants through the entire litigation from its inception on July 14, 1978. In the case of Bernstein and Kushner, the court calculated this sum at $341,020.57. In the case of Coldwell Banker, the amount of attorneys' fees and expenses reasonably incurred came to $244,832.23. The total fee award against Synanon was therefore $585,852.80.

### SYNANON'S GROUNDLESS, BAD FAITH LITIGATION MANOEUVRES AND ITS FRAUD UPON THE COURT

The trial court's award of fees rested on its finding that Synanon had litigated in bad faith. This finding was primarily based on information obtained by the defendants in July 1983, which revealed that for almost all of the five years of litigation Synanon had been systematically destroying potential trial evidence, much of it the subject of persistent discovery requests.

These revelations emerged from affidavits filed in a simultaneous court action upholding the Internal Revenue Service's revocation of Synanon's tax-exempt status. *See Synanon Church v. United States,* 579 F.Supp. 967 (D.D.C.1984). Bette Fleishman and George Farnsworth, two former residents of Synanon, told of their participation in the wholesale destruction of Synanon records. The destruction was orchestrated by Synanon's in-house legal staff, including its successive general counsels Dan Garrett and Phillip Bourdette, the latter at one time among counsel of record in this case. From this newfound information, it became clear that, in addition to destroying potential evidence, Synanon at-

torneys and executives had deliberately deceived the trial court and thus influenced the course of its discovery rulings.

### A. *Prior to Exposure of Synanon's Bad Faith Conduct*

The defendants served their first discovery request on February 6, 1979. This was about eight months after Synanon filed its complaint and about two months after Bernstein and Kushner filed their amended counterclaim. In that amended counterclaim, Bernstein and Kushner introduced their charge that Synanon had fraudulently procured the Agreement of Sale by concealing the organization's violent nature. About one-third of the February 6 interrogatories were designed to ascertain whether Synanon was a violent organization.

Specifically, the defendants requested transcripts or tapes of any morning "Think Table" discussions that concerned the violence issue. They also inquired about such matters as Synanon's "vasectomy policy" for its male residents. At the "Think Table" meetings Charles Dederich, Synanon's founder and leader, would give guidance to its members, his thoughts being broadcast over an in-house communication network known as the "wire." The product of these discussions was a Synanon archive of 10,000 tapes, some transcribed. The records were under the care of Steve Simon, Synanon's full-time archivist, who created a computerized subject matter index covering all "Think Table" transcripts and including some of the untranscribed tapes.

Synanon answered only some questions in response to the February 6 interrogatories. It refused to respond concerning its alleged "violence" or its "vasectomy policy," asserting that questions on these issues would not lead to the discovery of admissable evidence. Synanon also claimed that it would be unduly burdensome for it to unearth information contained in its extensive archives.

The following year, on January 18, 1980, a hearing was held before Judge William S. Thompson on the defendants' motion to compel answers. Dan Garrett, at that time Synanon's general counsel, represented to the court that compliance with the interrogatories would be unduly burdensome, claiming that someone would have to listen to all of the 10,000 tapes in the archive in order to provide the requested information. When confronted with an affidavit stating that Simon had indexed and referenced the tapes, Garrett offered through counsel "to state under oath or as an officer of the court or in any capacity that such indices do not exist." Relying on this representation from an officer of the court, Judge Thompson refused to allow the defendants to cross-examine Garrett, thinking that to do so would be "gratuitous." Judge Thompson accepted that compliance with the original discovery request would be unduly burdensome for Synanon and substantially limited the scope of the defendants' interrogatories.

In subsequent months, Synanon provided a meager response to the outstanding discovery requests. It repeated its statement that no subject matter index existed for the tapes or transcripts and referred the defendants instead to the daily programming log. On the occasions when the defendants did request particular tapes after inspecting the daily programming log, the tapes were seldom forthcoming. Synanon was unable to locate them.

The defendants filed a motion for sanctions due to Synanon's failure to produce the materials sought. After a hearing, Judge John D. Fauntleroy gave Synanon 90 days to produce the documents and tapes. Phillip Bourdette, having replaced Garrett as Synanon's general counsel, had joined the counsel of record in this case. On October 3, 1981, Bourdette filed an affidavit in the trial court stating under oath that he had personally supervised a search of the Synanon archives and could find none of the requested materials. At hearings in November 1981 and April 1982, Simon, Synanon's archivist, told the court that the requested "Think Table" tapes no longer

existed. He said that they had been routinely recycled, but that none had been deliberately destroyed. On April 26, 1982, in reliance upon these representations, Judge Fauntleroy vacated his earlier order compelling production of the requested materials.

The defendants subsequently filed a second motion for discovery sanctions against Synanon. That too was denied.

## B. *Synanon's Bad Faith Conduct Exposed*

Eventually, in July 1983, the defendants uncovered a massive, ongoing scheme to destroy information subject to discovery in this and other pending litigation.[3] Former Synanon residents Fleishman and Farnsworth revealed the existence throughout the proceedings of a subject matter index to the transcripts and some tapes, a fact which Synanon had consistently denied. By this time, Simon had erased a multitude of incriminating topic headings under the guidance of Synanon's in-house legal staff. In addition to tampering with the subject matter index in their desire to foil discovery requests, Synanon officials, including its general counsels Garrett and Bourdette, had deleted potentially incriminating information from the "Think Table" tapes and burned or hid tapes that could not be successfully "doctored." Fleishman and Farnsworth, who made these revelations, had actually participated in the deletion project under the supervision of their Synanon superiors.

Judge Leonard Braman dismissed Synanon's complaint after presiding over an eleven-day evidentiary hearing which turned upon the testimony of Fleishman and Farnsworth. It showed that Synanon had begun destroying discoverable records in October 1978—three months after Synanon filed its complaint, two months before

Bernstein and Kushner filed their amended counterclaim introducing the violence issue into the case (one of the sensitive topics in the destroyed tapes), and four months before the defendant's first discovery request was filed.

Farnsworth testified that in October 1978, Garrett and a Synanon resident spent two weeks in a trailer in California listening to and destroying tapes. Other tapes were flown out of the Synanon archives and burned under Simon's direction in November. More tapes were destroyed in December. That month, Bourdette had all of the Synanon tapes and transcripts put under the control of its legal department.

Farnsworth was responsible for running the Synanon archives' computer system. In March 1979, immediately after the defendants filed their first set of interrogatories, he was directed by Simon to purge key words and tape numbers from the computerized subject matter index. Farnsworth burned all evidence of deletion, having been told by Simon that the legal department had approved this project. Later, Bourdette explained to Farnsworth that the deletion project was designed to prevent various people engaged in litigation against Synanon from finding transcripts. This was legal, he said, so long as the deleted item had not yet been requested. In September 1979, the progress of the erasure project was reviewed at a meeting between Garrett and Simon at which Farnsworth was also present. More subject matter topics were deleted from the computer index then and again in January 1980.

The following month, Fleishman was recruited by the Synanon archives to delete and erase tapes under Simon's direction. The practice was for Bourdette to notify the archives department of "sensitive subjects" in pending litigation. Fleishman was instructed to identify all relevant tapes and these tapes were systematically destroyed

---

3. Two other pending cases of particular relevance were *Synanon Foundation v. Merriweather,* No. WEC–51550 (Cal.Super.Ct., Los Angeles County) and *Synanon Foundation v. Am. Broadcasting Cos.,* No. 735–174 (Cal.Super.Ct., Los An-

geles County). Another, *Synanon Foundation v. Time, Inc.,* No. 503510–4 (Cal.Super.Ct., Alameda County), was dismissed during the course of the events described here.

following their inspection by Simon, Bourdette's wife and another Synanon attorney. All evidence of deletion was also destroyed.

From the testimony of Farnsworth and Fleishman, it became apparent, not only that Synanon had done everything in its power to evade discovery requests, but also that on repeated occasions it had deliberately deceived the trial court in a temporarily successful attempt to influence its decisionmaking. On January 18, 1980, at the hearing on the defendants' motion to compel answers, Synanon's then general counsel, Garrett, had falsely represented to Judge Thompson that no subject matter index to the "Think Table" tapes ever existed. On February 29, 1980, Synanon had adopted the same position in filing its supplemental answers to the defendants' interrogatories. On October 3, 1981, Synanon's then general counsel, Bourdette, had filed an affidavit with Judge Fauntleroy saying that his personal search of the archives revealed none of the requested material. Despite these later denials, in November 1978, a month after the erasure project began, Bourdette had taken control over all Synanon tapes and transcripts, records from which requested material continued to be deleted. By April 1979, at the latest, he had openly approved the deletion project in a conversation with Farnsworth. At hearings in November 1981 and October 1982, Simon, Synanon's archivist, told Judge Fauntleroy that the tapes were routinely recycled and had not been deliberately destroyed. Simon later admitted to Fleishman that he had perjured himself in making this statement. Simon also spoke of an agreement between himself and Bourdette that Simon would have to lie in various proceedings. In reality, as Fleishman and Farnsworth revealed, the tapes were not routinely recycled and, since October 1978, Simon had actually been supervising the

tape, transcript and subject matter index erasure project, assisted by Garrett, Bourdette and other Synanon officials. At the time of the discovery hearings, Simon had given Judge Fauntleroy a computerized tape inventory from which entire tapes had been deleted at Simon's direction.

Fleishman and Farnsworth were found to be credible witnesses. Based upon their evidence Judge Braman concluded that archive materials were destroyed and that among them were references to "violence, money, purchase of guns, legal terror tactics, Holy War, changing partners or love match." On October 12, 1983, Judge Braman dismissed Synanon's complaint, and on November 9, 1984, awarded a total of $585,852.80 in attorneys' fees against Synanon.

## II

■ Under the "American rule," every party to a case shoulders its own attorneys' fees, and recovers from other litigants only in the presence of statutory authority, a contractual arrangement, or certain narrowly-defined common law exceptions. This rule found early expression in an eighteenth century case in which the Supreme Court disallowed a fee award against the losing party. The Court observed, with a hint of ambivalence, that "[t]he general practice of the United States is in opposition to [the award of attorneys' fees to the prevailing party]; and even if that practice were not strictly correct in principle, it is entitled to the respect of the court, till it is changed, or modified by statute." *Arcambel v. Wiseman*, 3 U.S. (3 Dall.) 306, 1 L.Ed. 613 (1796) (per curiam). The "general practice" from which the lower court had deviated was thus transformed into what gradually emerged as the American rule.[4]

4. The competing "English rule," which normally requires the losing party to pay the winner's legal expenses, governs in every other common law country. Zemans, *Fee Shifting and the Implementation of Public Policy*, 47 LAW & CONTEMP. PROBS. 187, 188 (1984). The English rule traces its ancestry to a thirteenth century statute which permitted successful plaintiffs to recover "costs," a term broadly construed to include attorneys' fees. Statute of Gloucester, 1278, 6 Edw. 1, ch. 1. The classic treatment of the English rule is Goodhart, *Costs*, 38 YALE L.J. 849 (1928).

Since that decision, the Supreme Court has apparently resolved its early doubts as to whether the American rule is "strictly correct in principle." It has suggested that preventing the prevailing party from recouping its litigation expenses from the loser serves to keep the courthouse door open. Since litigation is uncertain in its outcome, the theory goes, one should not be penalized for defending or prosecuting a lawsuit. More particularly, it is said that the poor would be unjustly discouraged from instituting actions to vindicate their rights if the cost of losing included the price of their opponent's counsel. Another, more pragmatic justification for the American rule is that it avoids the time, expense and difficulties of proof inherent in any judicial assessment of what amount in attorneys' fees it would be reasonable to impose upon the unsuccessful litigant. *See Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718, 87 S.Ct. 1404, 1407, 18 L.Ed.2d 475 (1967). Finally, the Supreme Court has suggested the possibility of "a threat being posed to the principle of independent advocacy by having the earnings of the attorney flow from the pen of the judge before whom he [or she] argues." *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974).[5]

To relieve the American rule of its potential rigor, courts and legislatures have fashioned certain exceptions in which the prevailing party is allowed to recoup reasonable attorneys' fees from the loser. *See generally Alyeska Pipeline Service Co. v. The Wilderness Society*, 421 U.S. 240, 257–59, 95 S.Ct. 1612, 1621–22, 44 L.Ed.2d 141 (1975); *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co., supra*, 417 U.S. at 129–30, 94 S.Ct. at 2165; *Hall v. Cole*, 412 U.S. 1, 4–7, 93 S.Ct. 1943, 1945–47, 36 L.Ed.2d 702 (1973); *Fleischmann Distilling Corp. v. Maier Brewing Co., supra*, 386 U.S. at 718–19, 87 S.Ct. at 1407–08. One of these permits an award of attorneys' fees against a party who has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons" connected to the litigation.[6] *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765–66, 100 S.Ct. 2455, 2463–64, 65 L.Ed.2d 488 (1980); *Alyeska Pipeline Service Co. v. The Wilderness Society, supra*, 421 U.S. at 259, 95 S.Ct. at

An understanding of the English rule sheds light on the origins of its American counterpart. One consequence of the English rule has traditionally been that the amount subject to recovery is heavily regulated, and the lawyer's ability to charge his or her own client also limited. Here, the gradual abandonment of the English rule during the revolutionary era and beyond can be explained as a lawyer's compromise—the advocate gained an unrestricted right to charge the client and, in return, relinquished the prospect of a judicially regulated recovery from the unsuccessful opponent. An interesting side-effect of this compromise was the rise of the contingent fee in this country, a method of payment which in turn consolidated the American rule, so that it reached its heyday in the late nineteenth century. *See* Leubsdorf, *Toward a History of the American Rule on Attorney Fee Recovery*, 47 Law & Contemp.Probs. 9, 13–17 (1984).

5. The contrasting justification for the rival English rule is, of course, that it enables the court to make prevailing parties whole after they have proven their case. *See, e.g.*, Rowe, *The Legal Theory of Attorney Fee Shifting: A Critical Overview, supra* note 2, 1982 Duke L.J. at 653–59. The Supreme Court has recognized the make-whole argument as having "some force." *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co., supra*, 417 U.S. at 129–30, 94 S.Ct. at 2165. Indeed, starting from this perspective, one objection to the American rule is that the prospective burden of paying their own legal fees may actually discourage the poor from asserting valid claims. Under this view, the availability in the United States of contingency fee arrangements is insufficient to protect the rights of poor people, because their claims are often too small to attract willing lawyers or the required relief is nonmonetary. Zemans, *Fee Shifting and the Implementation of Public Policy, supra* note 4, 47 Law & Contemp.Probs. at 189.

6. Bad faith has long been a relevant consideration. As far back as Roman law, where the award of attorneys' fees gradually evolved into the norm, the unsuccessful litigant could avoid payment only by demonstrating that bad faith was not a motivating factor. Code Just. 7.51.5; *see generally* L. Wenger, Institutes of the Roman Law of Civil Procedure 183–84, 330–34 (rev. ed. 1940).

1622; *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co., supra,* 417 U.S. at 129, 94 S.Ct. at 2165; *Hall v. Cole, supra,* 412 U.S. at 5, 93 S.Ct. at 1946.

In the District of Columbia, we have chosen to apply the general principles of the American rule. *In re Antioch University,* 482 A.2d 133, 136 (D.C.1984); *Trilon Plaza Co. v. Allstate Leasing Corp.,* 399 A.2d 34, 37 (D.C.1979). Along with it, we have adopted the so-called bad faith exception. *E.g., id.; Andrews v. District of Columbia,* 443 A.2d 566, 568–70 (D.C.), *cert. denied,* 459 U.S. 909, 103 S.Ct. 216, 74 L.Ed.2d 172 (1982); *American Federation of State, County & Municipal Employees v. Ball,* 439 A.2d 514, 514–15 (D.C.1981); *F.W. Berens Sales Co. v. McKinney,* 310 A.2d 601, 602 (D.C.1973).

■ Unlike the other exceptions to the American rule, which are primarily designed to encourage or to compensate worthy litigants, the bad faith exception is intended to punish those who have abused the judicial process and to deter those who would do so in the future. *See Kasachkoff v. Ross H. Finn, Co.,* 408 A.2d 993, 995 (D.C.1979) (per curiam). As explained by the Supreme Court, "[i]n this class of cases, the underlying rationale of 'fee shifting' is, of course, punitive, and the essential element in triggering the award of fees is therefore the existence of 'bad faith' on the part of the unsuccessful litigant." *Hall v. Cole, supra,* 412 U.S. at 5, 93 S.Ct. at 1946. Although recovery of fees incidentally compensates the prevailing party for costs which should not have been incurred, its primary function is "that the assessment of fees in such cases will deter abusive litigation in the future, thereby avoiding harassment and protecting the integrity of the judicial process." *Copeland v. Martinez,* 195 U.S.App.D.C. 399, 402, 603 F.2d 981, 984 (1979), *cert. denied,* 444 U.S. 1044, 100 S.Ct. 730, 62 L.Ed.2d 729 (1980).

In attempting to deter bad faith litigation through attorney fee awards, the court must scrupulously avoid penalizing a party for a legitimate exercise of the right of access to the courts. "A party is not to be penalized for maintaining an aggressive litigation posture, nor are good faith assertions of colorable claims or defenses to be discouraged." *Lipsig v. National Student Marketing Corp.,* 214 U.S.App.D.C. 1, 3–4, 663 F.2d 178, 180–81 (1980) (per curiam) (citations omitted).

■ Attorneys' fees for bad faith litigation are therefore proper only in the presence of extraordinary circumstances or when dominating reasons of fairness so demand. *Launay v. Launay, Inc.,* 497 A.2d 443, 450 (D.C.1985); *Andrews v. District of Columbia, supra,* 443 A.2d at 569; *Kasachkoff v. Ross H. Finn, Co., supra,* 408 A.2d at 995. "The standards of bad faith are necessarily stringent." *Adams v. Carlson,* 521 F.2d 168, 170 (7th Cir.1975).

We need not dwell long on the question whether these standards have been met. If ever there were a case of bad faith litigation, this is it.

■ There were two ways in which Synanon displayed bad faith warranting an award of attorneys' fees. First, it perpetrated a fraud upon the court, conduct which we condemned in *Synanon I.* This warranted the sanction of an attorneys' fee award. *See Universal Oil Products Co. v. Root Refining Co.,* 328 U.S. 575, 580, 66 S.Ct. 1176, 1179, 90 L.Ed. 1447 (1946); *Toledo Scale Co. v. Computing Scale Co.,* 261 U.S. 399, 426–28, 43 S.Ct. 458, 465–66, 67 L.Ed. 719 (1923). "No fraud is more odious than an attempt to subvert the administration of justice." *Hazel-Atlas Glass Co. v. Hartford-Empire Co.,* 322 U.S. 238, 251, 64 S.Ct. 997, 1004, 88 L.Ed. 1250 (1944) (Roberts, J., dissenting). As the Supreme Court has observed,

tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be to-

lerated consistently with the good order of society.

*Hazel-Atlas Glass Co. v. Hartford-Empire Co., supra,* 322 U.S. at 246, 64 S.Ct. at 1001.

The fee award is also justified on the ground that, aside from its deception of the trial court, Synanon engaged in groundless, bad faith litigation manoeuvres by cynically attempting to foil the discovery process. *Cf. American Federation of State, County & Municipal Employees v. Ball, supra,* 439 A.2d at 514–15 (refusal to obey court order compelling discovery justified award of bad faith attorneys' fees). "An equity court has the unquestioned power to award attorney's fees against a party who shows bad faith by delaying or disrupting the litigation...." *Hutto v. Finney,* 437 U.S. 678, 689 n. 14, 98 S.Ct. 2565, 2573, 1457 L.Ed.2d 522 (1978). As one court has remarked, "[w]e are all too aware of the harvest of exacerbation which hoary litigation reaps." *In re Boston & P.R.R.,* 501 F.2d 545, 549 (1st Cir.1974).

The trial court made the requisite finding of bad faith, *Charles v. Charles,* 505 A.2d 462, 467 (D.C.1986), one which we have no cause to disturb. The court did not abuse its discretion in awarding attorneys' fees against Synanon for its fraud upon the court and for its bad faith litigation tactics.

### III

A more complex question must yet be answered. How should the bad faith attorneys' fee award against Synanon be calculated? The trial court awarded defendants Bernstein, Kushner and Coldwell Banker $585,852.80, the entire amount in attorneys' fees incurred by them throughout the litigation of this suit. In our view, the trial court failed to ensure the existence of a nexus between the groundless, bad faith litigation manoeuvres engaged in by Syna-

non, and the attorneys' fees awarded against it. Thus, the trial court superimposed upon the bad faith attorneys' fee award an additional penalty more accurately described as punitive damages. We remand for the trial court to reduce its award by any amount in attorneys' fees not connected to Synanon's bad faith litigation.[7]

Bad faith may be present when a litigant *"brings* or *maintains* an unfounded suit...." *Cahn v. Antioch University,* 482 A.2d 120, 133 (D.C.1984) (quoting *1901 Wyoming Avenue Cooperative Association v. Lee,* 345 A.2d 456, 464–65 (D.C. 1975)) (emphasis added). Put differently, the conduct which would justify an award of bad faith attorneys' fees may be found either in the filing of a frivolous claim or in the manner in which a properly filed claim is subsequently litigated.

■ The measure of the fee award differs depending on which is the case. Bad faith attorneys' fee awards are limited to payment for work and expense attributable to the guilty party's bad faith endeavors. *Lipsig v. National Student Marketing Corp., supra,* 214 U.S.App.D.C. at 4 n. 21, 663 F.2d at 181 n. 21; *see also Wright v. Jackson,* 522 F.2d 955, 958 (4th Cir.1975); *Marston v. American Employers Insurance Co.,* 439 F.2d 1035, 1042 (1st Cir. 1971); *Aero Corp. v. Department of the Navy,* 558 F.Supp. 404, 429 (D.D.C.1983); *cf. Andrews v. District of Columbia, supra,* 443 A.2d at 569 (bad faith attorneys' fee award "makes the prevailing party whole for expenses caused by his [or her] opponent's obstinacy" (quoting *Hutto v. Finney, supra,* 437 U.S. at 689 n. 14, 98 S.Ct. at 2573 n. 14). Therefore, where a suit has been filed in bad faith, the court has discretion to award the entire legal expenses incurred by the defendant. Conversely, "in an action not in itself brought in bad faith, an award of attorneys' fees

---

7. Synanon does not suggest that the fees were unreasonable in light of the work done. Its contention is that certain portions of the litigation should not have been considered in calculating the attorneys' fee award. Nor are we presented here with the question whether the trial court has inherent power to assess monetary sanctions against a bad faith litigant apart from any award of attorneys' fees.

should be limited to those expenses reasonably incurred to meet the other party's groundless, bad faith procedural moves." *Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078, 1089 (2d Cir.1977).

The reason for this rule is evident. If a bad faith litigant is compelled to compensate his or her opponent for legal expenses unrelated to the conduct warranting an attorneys' fee award, that award is not truly attorneys' fees at all but rather punitive damages under another name. We do not suggest that an award of punitive damages would have been inappropriate in the present case, but such an award was not made, nor could it have been absent a trial.

■ In any event, the amount in attorneys' fees incurred by the defendants is not an accurate measure of the punitive damages that might properly have been awarded against Synanon. It is long established that, where punitive damages are warranted,

> the degree of punishment to be thus inflicted must depend on the peculiar circumstances of each case. It must be evident, also, that as it depends upon the degree of malice, wantonness, oppression, or outrage of the [litigant's] conduct, the punishment of his [or her] delinquency cannot be measured by the expenses of the [opponent] in prosecuting his [or her] suit.... [T]he amount of these fees cannot be taken as the measure of punishment or a necessary element in its infliction.

*Day v. Woodworth*, 54 U.S. (13 How.) 363, 371, 14 L.Ed. 181 (1851); *cf. Rachal v. Rachal*, 489 A.2d 476, 478 (D.C.1985) ("'To add to the calculus [of what is a reasonable award] any factor such as the motivation of either party in pursuing the litigation creates the very real risk of turning an award of attorney's fees into punitive damages....'"); *McIntosh v. Aetna Life Insurance Co.*, 268 A.2d 518, 521 (D.C.1970) (attorneys' fees are not compensable damages); *Murphy v. O'Donnell*, 63 A.2d 340, 342 (D.C.1948) (same).

In this case, the trial court concluded that attorneys' fees for the entire case were justified by Synanon's conduct during the course of its litigation. It remarked that "[s]ince the filing of its suit on July 14, 1978, Synanon's fraud and bad faith litigation tactics have tainted virtually every phase of the discovery process in this litigation, commencing with [Synanon's] unresponsive answers to Bernstein and Kushner's first set of interrogatories in April 1979." Findings of Fact and Conclusions of Law at 1 (Nov. 9, 1984). We have no quarrel with that finding.

More troublesome is the finding that Synanon's filing of its complaint arising out of the Boston House dispute was unfounded:

> Indeed, the court finds that not only has plaintiff litigated the case in bad faith, but, in addition, the case was initiated in bad faith. The conclusion is irresistible that when this suit was brought, the officers of Synanon knew full well that within Synanon's archives there were materials which would defeat its claim which rested upon its presumed nonprofit status. They then set about, within a matter of a mere few months, to destroy evidence. That effort got under way, as recounted in the findings and conclusions of October 12, 1983, [dismissing Synanon's complaint], in October 1978, shortly after the arrest of [two Synanon members] arising out of the rattlesnake murder attempt on [a lawyer engaged in other litigation against Synanon].

*Id.* at 1–2. "Moreover," the trial court continued, "Synanon indelibly branded its complaint papers with bad faith when, after its hands were soiled with destroying evidence and perjury, it cynically (but successfully) moved on December 8, 1982, to amend its complaint by *increasing* its damages substantially." *Id.* at 2 (emphasis in original). For these reasons, the trial court awarded the defendants "all of their reasonable attorney's fees and expenses incurred during the six-year litigation of this action." *Id.*

At the outset, we reject the trial court's theory that Synanon's amendment of its complaint four and a half years after filing "indelibly branded [the] complaint papers with bad faith." No rational connection between events so far apart justifies the inference that the Boston House action was instituted in bad faith and that attorneys' fees for the entire litigation were therefore appropriate. In this court, appellants Bernstein and Kushner attempt to defend the trial court's theory by reference to Super.Ct.Civ.R. 15(c), which provides that amendments to pleadings relate back to the original pleading provided that they arise out of the same facts and occurrences. Conceding that theirs is "admittedly a novel approach," Bernstein and Kushner urge us to hold that Rule 15(c) operates to ensnare wrongdoers just as it does to confer a benefit on good faith litigants, "both through precisely the same legal fiction of relation back." Brief at 16. This argument is unpersuasive.

Aside from the amendment to the complaint, the trial court also inferred from other events occurring after filing that the Boston House action was originally instituted in bad faith. This inference is equally unsupported.

The test for determining that an action has been instituted in bad faith—as opposed to subsequently so litigated—is not met in this case. "An action is brought in bad faith when the claim is entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons. Otherwise those with colorable, albeit novel, legal claims would be deterred from testing those claims in ... court." *Browning Debenture Holders' Committee v. DASA Corp., supra,* 560 F.2d at 1088. Applying this standard, the *Browning* court reversed an award of attorneys' fees to the extent that it relied upon a finding of bad faith filing, but approved the award of a lesser amount tied to "those procedural motions or other actions undertaken in bad faith, without justification or for an improper purpose, such as harassment or delay." *Id.* In doing so, the court pointed out that "[n]o attempt was made below to relate claimed expenses to particular bad faith maneuvers." *Id.* (citations omitted). After remand, the Second Circuit affirmed not only the suitably reduced award of attorneys' fees, but also a permanent injunction against further bad faith litigation by the wrongdoer. *Browning Debenture Holders' Committee v. DASA Corp.,* 605 F.2d 35, 50 A.L.R.Fed. 643 (2d Cir.1978).

Similarly, in *Nemeroff v. Abelson,* 620 F.2d 339 (2d Cir.1980) (per curiam), the Second Circuit found a lack of "clear evidence" that a claim was "entirely without color" at the time the action was commenced:

A claim is colorable, for the purpose of the bad faith exception, when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim. The question is whether a reasonable attorney could have concluded that facts supporting the claim *might be established,* not whether such facts actually *had been established.*

*Id.* at 348 (citation omitted; emphasis in original). Applying this standard, the court decided that the action was commenced in good faith, reversed the trial court's award of attorneys' fees for the entire litigation, and remanded the case for findings as to the propriety of the conduct of the plaintiff and his attorneys during the course of the litigation. *Id.* at 350–51. After remand, the Second Circuit upheld a more limited award of attorneys' fees, on the ground that although the action was commenced in good faith, at a certain point it became clear that there was no colorable basis for the plaintiff's claims and that thereafter the suit was continued in bad faith. *Nemeroff v. Abelson,* 704 F.2d 652 (2d Cir.1983); *see generally* Comment, *Nemeroff v. Abelson, Bad Faith, and Awards of Attorneys' Fees,* 128 U.Pa.L. Rev. 468 (1979).

In the case before us, as the trial court pointed out, Synanon began engaging in its bad faith litigation tactics in October 1978. In that month, Synanon general counsel Dan Garrett and others listened to and destroyed "Think Table" tapes in anticipation of discovery requests in this and other pending litigation. Thereafter, Synanon's litigation tactics became ever more ruthless, until they culminated with a massive fraud upon the court. From this bad faith conduct, starting three months after the filing of Synanon's complaint, the trial court described as "irresistible" the conclusion "that when this suit was brought, the officers of Synanon knew full well that within Synanon's archives there were materials that would defeat its claim which rested upon its presumed nonprofit status." In our view, the "irresistible" inference that Synanon knowingly filed an unfounded complaint does not follow from its later conduct.

The dispute upon which Synanon's complaint was based arose out of its contract to purchase the Boston House from Bernstein and Kushner. On July 14, 1978, after encountering increasing problems before completion of the transaction, Synanon instituted proceedings against Bernstein and Kushner, their real estate broker, Coldwell Banker, and its sales agent, Kabler. Synanon's complaint alleged fraud, breach of contract, and breach of warranty. On its face, particularly given Kabler's alleged failure to inform Synanon that the floor load capacity of the Boston House was insufficient for office use, the action was colorable at the time of filing.

The trial court's finding that Synanon's action was commenced in bad faith can therefore be upheld only if the inference was permissible that, at the time the complaint was filed, Synanon's officers knew that within their archives were materials which would defeat the claim—a claim which the trial court described as resting upon its presumed nonprofit status.

Upon closer inspection, two factual inferences and two legal conclusions lie hidden in this line of reasoning. The first factual inference is that at the time of filing the Synanon officers knew the nature of the materials contained in its archives. This inference is not clearly erroneous and we are bound by it. Next comes the first legal conclusion, that these materials were sufficient to strip Synanon of its nonprofit status; and then the second legal conclusion, that the vulnerability of Synanon's nonprofit status would defeat its complaint for fraud, breach of contract, and breach of warranty in the sale of real estate. Finally, the second factual inference is that the Synanon officials were actually aware of these twin legal conclusions and recognized them as fatal to its claim.

In a separate statement filed in *Synanon I,* 503 A.2d at 1264–71, one member of the division deciding that case questioned the authority of the defendants, as opposed to the District of Columbia government, to challenge the nonprofit status of a corporation registered under the laws of California and operating in the District with a certificate of authority from the Mayor. *Id.* at 1267–71. The separate statement also argued that, even if it were true that Synanon was not entitled to nonprofit status, its for-profit status would be irrelevant to the outcome of its complaint for fraud, breach of contract, and breach of warranty in the sale of a piece of real estate. *Id.* at 1271. Under this latter theory, although a for-profit status might preclude Synanon's later *use* of the Boston House for office purposes under the applicable zoning laws, such restrictions would have no bearing on Synanon's right to *own* the building, and therefore no bearing on its ability to sue on the Agreement of Sale.

Our disposition of *Synanon I* on other grounds made it unnecessary for us to decide there the concerns raised in the separate statement. Nor need we resolve them here. For our purposes it is enough that, at the time of filing, the allegations in Synanon's complaint were not entirely without color, that they had some legal and factual support, and that a reasonable attorney could have concluded that facts sup-

porting the claim might be established. Accordingly, the second factual inference drawn by the trial court—that the Synanon officers were aware of compelling legal conclusions fatal to their claim—was clearly erroneous.

Because the record does not suggest a clear inference that Synanon's complaint was filed in bad faith, we must remand for the trial court to reduce its award of attorneys' fees. Rather than awarding the defendants all of their legal expenses for the entire litigation, the trial court should have limited the fee award to amounts actually attributable to the groundless, bad faith manoeuvres engaged in by Synanon after its complaint was filed.

## IV

Because the fee award was calculated on the erroneous premise that the complaint was filed in bad faith, we must consider how the trial court should measure the award of attorneys' fees on remand. There was an initial period of litigation during which no bad faith was evident, followed by two successive periods of increasingly inexcusable bad faith litigation tactics, culminating with calculated perjury. No bad faith attorneys' fees are justified for the first period, but an award of all fees incurred by the defendants is warranted for both of the later periods. Also, we hold that in the unusual circumstances of the present case an award of bad faith attorneys' fees on the counterclaim was proper, although the counterclaim is still pending in the trial court. We discuss the various stages of bad faith litigation in reverse chronological order.

### From January 18, 1980, to the Dismissal of the Complaint

In *Synanon I*, we upheld the dismissal of the complaint on the ground that Syna-

non executives and attorneys perpetrated a fraud upon the court warranting that extreme sanction. 503 A.2d at 1262–64. At least from January 18, 1980, Synanon reached the depths of its iniquity with its fraud upon the court. On that date its general counsel, Dan Garrett, made deliberately false representations to the court during a hearing before Judge Thompson and, from then onwards, Synanon executives and attorneys engaged in a calculated attempt to subvert the integrity of the judicial system through repeated perjury. Whatever merit Synanon's complaint might have initially possessed was entirely vitiated by this flagrant abuse of the judicial process. For the period beginning January 18, 1980, and continuing up to the dismissal of the complaint, we conclude that all attorneys' fees incurred in defending this litigation were properly included in the award. So too were the later expenses incurred in the assessment of the attorneys' fee award.

### From an as yet Undetermined Date in October 1978 to January 18, 1980

The immediately preceding period was that beginning sometime in October 1978, when Dan Garrett and others began listening to and destroying "Think Table" tapes in anticipation of discovery requests in this and other pending litigation.[8] In *Synanon I* we declined to rule on the trial court's finding that the destroyed materials would have been fatal to Synanon's complaint. 503 A.2d at 1255. Nor do we rule on that issue here, because our reasoning does not require us to do so. While we recognize that the destruction of potentially discoverable materials may not always rise to the level of fraud represented by Synanon's deliberate deception of the trial court, it is

---

8. The trial court made no actual finding as to the date on which the erasure project began. It did indicate that the destruction of evidence began "immediately," "shortly," or "later in the same month" after the arrest of two Synanon members for placing a rattlesnake in the mailbox of an attorney engaged in other litigation against Synanon. *See Synanon Foundation v. Merriweather, supra* note 3. The attempted rattlesnake murder apparently took place on October 11, 1978. Although bitten, the attorney survived. The trial court noted that in December 1978 Charles Dederich, Synanon's founder and leader, was also arrested for this incident.

indisputable that the calculated, carefully orchestrated, and wholesale nature of the destruction here, over a period of several years, was conduct constituting bad faith litigation tactics for the purpose of an attorneys' fee award.

Synanon officials and attorneys, starting within three months after the complaint was filed, sought to corrupt the administration of justice by systematically destroying materials they thought subject to discovery. Regardless of the relevance of these materials to the substantive legal issues in this case, the cynicism of this behavior cannot be entirely extricated from the pattern of fraud perpetrated upon the trial court by Synanon. Such conduct was enough to completely taint Synanon's entire litigation strategy from the date on which the abuse actually began. As stated by the trial court, "assuming arguendo that the initiation of this suit was one that was taken in good faith, within three months ... whatever good faith attended the opening of the litigation was massively submerged and transformed into a fraudulent litigation." Proceedings on defendants' motions for award of attorneys' fees, expenses and costs, transcript at 105–06 (Sept. 4, 1984).

The award of bad faith attorneys' fees for all of the defendants' reasonable litigation expenses was therefore proper from the point in October—which date must be determined upon remand by the trial court—when Dan Garrett and his companions began destroying evidence in anticipation of prospective discovery requests.

FROM JULY 14, 1978, TO AN AS YET UNDE-
TERMINED DATE IN OCTOBER 1978

With respect to Synanon's complaint, that leaves only the period between July 14, 1978, when the complaint was filed, and the unspecified date in October 1978 when Synanon began litigating in bad faith. Because there is not clear evidence that Synanon engaged in bad faith litigation tactics during this period, we hold that any award

of attorneys' fees to the defendants for expenses incurred during this time was improper, and that the total award must be reduced by that amount.

THE COUNTERCLAIM

Finally, we turn to Bernstein and Kushner's counterclaim. Attorneys' fees on the counterclaim were included in the total award against Synanon, although the counterclaim survived the dismissal of the complaint. In such circumstances, the better approach is to keep separate accounts of the legal expenses incurred in the main action and on the counterclaim and to award attorneys' fees on the counterclaim, if at all, only after its disposition. In that event, the propriety of the fee award on the counterclaim could be considered on any appeal separate from the attorneys' fees at issue here.

Such an approach was not followed in this case. However, the possibility that a fee award on the unresolved counterclaim was premature does nothing to alter the fact that Synanon's entire litigation strategy was infected with bad faith from the as yet undetermined date in October 1978 when its inexcusable tactics commenced. From that point, an award of bad faith attorneys' fees for all of the defendants' legal expenses was proper, and those expenses included those incurred litigating the counterclaim. Accordingly, we do not require the trial court to await final disposition of the counterclaim in this case.

The counterclaim was dated, as was Bernstein and Kushner's answer, on September 8, 1978, before Synanon's bad faith litigation tactics began the following month. In the extreme circumstances before us here, we need remand only for separate computations as to what fees were incurred on the counterclaim prior to the commencement of Synanon's bad faith litigation in October 1978. If fees were awarded for work done on the counterclaim during that period, the award to Bernstein

**44**

and Kushner must be reduced by that amount.[9]

## CONCLUSION

Synanon's groundless, bad faith manoeuvres during the course of this litigation, including its fraud upon the court, amply justified an award of attorneys' fees. We hold, however, that the trial court was without clear evidence to support its conclusion that the complaint was initially filed in bad faith. We reverse the award of attorneys' fees for the entire litigation from its inception. We remand to the trial court for it to determine the precise October 1978 date upon which Synanon general counsel Dan Garrett and others began destroying evidence in anticipation of discovery requests in this case. The trial court must reduce its $585,852.80 bad faith attorneys' fee award by any amounts incurred by the defendants prior to that date.[10]

*So ordered.*[11]

---

9. We express no view as to the propriety of attorneys' fees for further litigation on the counterclaim.

10. Although defense papers were filed prior to October 1978, the $341,020.57 awarded to defendants Bernstein and Kushner was apparently limited to attorneys' fees incurred during the period beginning November 1, 1978. If it is the fact that none of these fees was incurred during or before October 1978, when the groundless, bad faith litigation manoeuvres began, our holding would leave intact the entire award to Bernstein and Kushner.

The $244,832.23 awarded to defendant Coldwell Banker represents attorneys' fees incurred during the period beginning July 18, 1978, a period which included some fees incurred before Synanon commenced its bad faith litigation tactics. It must therefore be reduced.

11. As in *Synanon I,* we are directing the Clerk of this court to forward a copy of this opinion to Bar Counsel of the District of Columbia and to the disciplinary authorities of other appropriate jurisdictions.