**In re Sally JUMPER;**

**William N. Rogers, et al., Appellants.**

**Nos. 08–PR–1006, 08–PR–995.**

District of Columbia Court of Appeals.

Argued Sept. 9, 2009.
Decided Dec. 10, 2009.
As Amended Dec. 24, 2009[1].

---

**1.** This opinion was issued originally on December 10, 2009. The amended opinion is being issued to clarify that Super. Ct. Prob. R. 312 applies to proceedings "filed under the District of Columbia Guardianship, Protective Proceedings, and Durable Power of Attorney Act," not to all "probate proceedings," as suggested at pages 26 and 37 of the original opinion. The court's application of Super. Ct. Prob. R. 312 to the facts of this case and the court's disposition of this case are unaffected by the changes made in this amended opinion.

William J. Carter, Washington, for appellant Anderson.

William N. Rogers, pro se.

Andrea J. Sloan, pro se.

Before REID, GLICKMAN, and OBERLY, Associate Judges.

OBERLY, Associate Judge:

Sally Jumper is dead, but a dispute arising out of the handling of her assets lives on. We must decide whether the trial court abused its discretion by sanctioning Allen Anderson, a friend of Ms. Jumper's, and William Rogers, Mr. Anderson's attorney, for the manner in which the pair conducted litigation over Ms. Jumper's assets. We affirm in part and vacate and remand in part the order awarding sanctions.

## I. Facts and Procedural History

### A. Background: Sally Jumper, Allen Anderson, and Jan Verfurth.

Sally Jumper led an interesting life. Born in Detroit, Michigan, in the early 1920s, Ms. Jumper, an only child who never married, was educated at the Connecticut College for Women. As a young woman, Ms. Jumper worked as an interior designer, traveled in Europe, and went on to become an accomplished painter, sculptor, and musician. Although Ms. Jumper was stricken with blindness as an adult,

she continued to be independent and worked as a psychotherapist until her retirement. In 2002, when the litigation that led to the present appeals began, Ms. Jumper lived at a continuing care facility in Washington, D.C.[2] We do not know precisely when she died, but the record tells us that by March 2004 Ms. Jumper had passed away.

Allen Anderson, one of the appellants in this case, was a long-time friend of Ms. Jumper's. At the sanctions hearing, Mr. Anderson described how he first saw Ms. Jumper decades before the proceedings began, when he was riding the bus to work. As Mr. Anderson recalled, he "saw this blind lady walking" with her seeing-eye dog and "wonder[ed]" whether "she would need books and articles and papers read to her." Mr. Anderson approached Ms. Jumper the next day, and they struck up a 30–odd year relationship that, according to Mr. Anderson, left people thinking that the two were husband and wife.

Ms. Jumper also had a long-standing, albeit less personal, relationship with Colonel Jan Verfurth. Col. Verfurth (who, as we shall learn, turned out to be a nemesis of Mr. Anderson's) testified that he first met Ms. Jumper in 1984 or 1985 when he was introduced to Ms. Jumper to serve as her stockbroker and financial adviser. According to Col. Verfurth, by 1995 Ms. Jumper's "portfolio had grown nicely," so

Col. Verfurth recommended that Ms. Jumper "consider some trust planning documents." Ms. Jumper agreed with the suggestion, and Col. Verfurth set up a meeting for Ms. Jumper with I. Mark Cohen, an attorney specializing in estate planning. Mr. Anderson drove Ms. Jumper to the meeting where Ms. Jumper signed her estate-planning documents, but did not take part in that meeting himself. According to Col. Verfurth, Mr. Cohen advised Mr. Anderson, "sir, you will not be able to attend the signing because you are mentioned in the will and it would be inappropriate for you to be there."

### B. The 1995 and 2001 estate-planning documents.

On October 6, 1995, as a result of her meetings with Mr. Cohen, Ms. Jumper executed several estate-planning documents, and Mr. Anderson figured prominently in each. For purposes of this case, the most important document that Ms. Jumper executed was the Sally A. Jumper Trust ("the 1995 Trust"). The 1995 Trust designated Ms. Jumper to serve as the initial Trustee, and provided that Mr. Cohen would assume the duties of Trustee if Ms. Jumper "cease[d] to serve as Trustee." The 1995 Trust provided that upon Ms. Jumper's death, 40% of her residual Trust Fund was to be distributed to Mr. Anderson.[3]

Fast forward to January 2001,[4] when Ms. Jumper executed another set of es-

---

**2.** Our account of Ms. Jumper's life is drawn from the report of a court-appointed nurse practitioner who examined Ms. Jumper in 2002, and who, in turn, obtained some of her information from Mr. Anderson. We are mindful that Mr. Anderson may not have been entirely objective regarding Ms. Jumper, but we see no harm in citing the nurse practitioner's report for the purposes of background.

**3.** Ms. Jumper also executed a Durable Medical Power of Attorney, in which she provided that if a "licensed physician ... determined that [Ms. Jumper was] incapable of making

an informed decision about" her medical treatment, Mr. Anderson was appointed as Ms. Jumper's attorney-in-fact to "do whatever he ... believe[d was] required with respect to [Ms. Jumper's] medical care and treatment." And in a Durable Limited Power of Attorney that was effective "immediately," Ms. Jumper appointed Mr. Anderson as her attorney-in-fact (with Mr. Cohen as the alternate) to perform a number of tasks related to Ms. Jumper's finances.

**4.** In between, on June 12, 1996, Ms. Jumper executed another Durable Medical Power of

tate-planning documents, including another iteration of the Sally A. Jumper Trust ("the 2001 Trust"). This time around, Ms. Jumper was represented by Cassandra Kincaid, not Mr. Cohen.

Although the 2001 Trust was similar for the most part to the 1995 Trust, the two trusts differed dramatically in their treatment of Mr. Anderson. As stated above, the 1995 Trust *required* the Trustee to distribute forty percent of Ms. Jumper's residual estate to Mr. Anderson. The 2001 Trust, by contrast, provided that upon Ms. Jumper's death and while Mr. Anderson was still alive, the Trustee was to "pay and distribute to or for Allen's benefit as much of the net income and as much of the principal of the Trust Fund as [the] Trustee, *exercising sole discretion, may determine necessary or proper to provide for his health, education, support and maintenance.*" (Emphasis added.) The 2001 Trust directed that after Mr. Anderson's death, the Trustee was to distribute the balance of the Trust Fund among several charitable causes, including Ms. Jumper's alma mater, by then known as Connecticut College. *See* http://aspen.conncoll.edu/camelweb/index.cfm?fuse action= offices & circuit=ehb & function=sec & action=1 (last visited Dec. 8, 2009).

In addition, the 2001 Trust, while retaining Ms. Jumper as the initial Trustee, provided that Col. Verfurth, not Mr. Cohen (as under the 1995 Trust), was to be the alternate Trustee. Regarding this change, Col. Verfurth testified that Ms. Jumper had asked him to serve as the successor trustee in 1995, but that Col.

Verfurth's employer instructed him to decline that invitation because Col. Verfurth at the time was Ms. Jumper's financial adviser, which raised a potential conflict of interest. By 2001, Col. Verfurth was retired and thus free to serve as the Trustee.

## C. 2001: Things turn sour.

About six weeks after the 2001 Trust fundamentally altered Mr. Anderson's stake in Ms. Jumper's estate, Mr. Anderson began documenting his concern for Ms. Jumper's mental state.[5] For instance, in a March 3, 2001 "Memo for the Record," Mr. Anderson wrote of how "deeply Sal [had] sunk into a mild dementia." Mr. Anderson wrote that when he visited her, "Sally was not completely dressed but was eating her breakfast." In addition, Mr. Anderson wrote that Sally had asked him, supposedly "in a tone that is used when one is not sure who they are talking to . . . 'Where do *you* live?'" Finally, Mr. Anderson had brought soft toilet paper and paper towels for Ms. Jumper's use, but reported that Ms. Jumper told him that "she [was] not used to having people deliver things to her, and that she [was] not used to [Mr. Anderson] delivering such things!!" Mr. Anderson found this statement suspicious because he in fact had "been delivering stuff [though not necessarily toilet paper] to her for many, many years (actually, decades)." In sum, Mr. Anderson's March 3, 2001 visit to Ms. Jumper caused him to "worr[y] . . . greatly" about "how easy it would be for any unscrupulous persons to take advantage of [Ms. Jumper], such as having her re-do

---

Attorney on essentially the same terms as the October 6, 1995 Durable Medical Power of Attorney.

**5.** Mr. Anderson gave conflicting testimony about his knowledge of the 2001 documents. Initially, Mr. Anderson agreed that in "early

2001" Col. Verfurth had told him that Ms. Jumper's estate-planning documents had been "redone." At the third day of the hearing on the sanctions, however, Mr. Anderson denied becoming "aware" of either the 1995 estate-planning documents or the 2001 estate-planning documents until September 2002.

her legal papers." "If I ever discover that such is in fact the case," Mr. Anderson concluded his Memo for the Record, "I will take appropriate action."

A letter that Mr. Anderson wrote on February 26, 2001, to a doctor of Ms. Jumper's sounded a similar note. Mr. Anderson wrote that Ms. Jumper apparently had asked him about her car, even though, according to Mr. Anderson, Ms. Jumper had not had a car in at least fifty years. Mr. Anderson was relieved that "[a]t least this time Sally did not ask me to set out a bowl of water for her (long dead) Seeing Eye dog, Trini." Mr. Anderson's observations led him to believe that "Sally [was] progressively descending into senile dementia." In light of Ms. Jumper's purported decline, Mr. Anderson found it "questionable whether she [was] capable of making *any* kind of decision that required sustained rational thought."

Mr. Anderson also wrote to Mr. Cohen, the successor trustee under the 1995 Trust. Whereas Mr. Anderson's Memo for the Record and letter to Ms. Jumper's doctor made oblique references to Ms. Jumper's ability to make important decisions, the letter to Mr. Cohen, an attorney, tied Mr. Anderson's concern over Ms. Jumper's mental state to her estate-planning documents. In that letter, Mr.

Anderson wrote: "Sally Jumper's personal physician ... recently stated that Sally is 'not mentally competent' (sic) to make decisions about her medical care and needs." ("sic" in original). In view of that alleged statement by Ms. Jumper's physician and Mr. Anderson's personal experiences with Ms. Jumper, Mr. Anderson "question[ed] [Ms. Jumper's] mental competence to have had all her documents re-written." Furthermore, Mr. Anderson wrote that he "no longer [had] any trust in or confidence in the Verfurths." "I find it interesting," Mr. Anderson wrote to Mr. Cohen, "that you too were not aware she had re-done her papers. ....especially since you are the back-up trustee ....or were. I have been her friend for 30 years." (Ellipses in original.) A few weeks after Mr. Anderson's letter to him, Mr. Cohen wrote to Col. Verfurth that he had learned that Ms. Jumper had "executed revised documents in which [he was] no longer her back-up Trustee."

Several months later, in August 2001, Mitchell J. Shapiro—Mr. Anderson's lawyer at the time—wrote to Col. Verfurth to express Mr. Anderson's concern about Ms. Jumper's finances. Noting that Mr. Anderson held a power of attorney for Ms. Jumper,[6] Mr. Shapiro wrote that Mr.

---

**6.** It is not clear upon which of the plethora of powers of attorney Mr. Shapiro and Mr. Anderson were relying in the August 17, 2001, letter. The letter itself notes that "a copy of the document appointing Mr. Anderson" was enclosed in the letter, but in the record no enclosure follows the letter. According to William Rogers, Mr. Anderson's attorney in 2002, the power of attorney that Mr. Anderson believed gave him the right to an accounting was a "general power of attorney with a durable provision" from April 1995. The only document in the record matching that description, however, is a medical power of attorney that does not purport to authorize Mr. Anderson to have access to Ms. Jumper's financial affairs.

When Mr. Shapiro wrote to Col. Verfurth there also was in effect a Durable Limited Power of Attorney from October 6, 1995. Although that document did grant Mr. Anderson certain authority over Ms. Jumper's finances, it is unclear whether it included the power to obtain an accounting of Ms. Jumper's assets under the 1995 Trust. In any event, that power of attorney was a problematic source of authority for Mr. Anderson because it provided that "[i]n the event that there is a conflict between my attorney-in-fact hereunder and my trustee(s) under the SALLY A. JUMPER TRUST, dated the sixth day of October, 1995, the decision(s) of my trustee under said trust shall control."

Anderson was "concerned about possible dissipation of Ms. Jumper's assets" and asked that Col. Verfurth provide an accounting of Ms. Jumper's assets. Mr. Anderson eventually conceded that he did not have a legal basis to seek an accounting—indeed, he later sought to become Ms. Jumper's guardian precisely to have that power—and that he had no evidence that Col. Verfurth had mismanaged Ms. Jumper's funds or engaged in any other impropriety. In an attempt to explain why an accounting was necessary nonetheless, Mr. Anderson cited the "fiasco" at the accounting firm Arthur Andersen. *See generally, e.g.*, Kurt Eichenwald, *Enron's Many Strands: The Accountants; Miscues, Missteps and the Fall of Andersen*, N.Y. TIMES, May 8, 2002, at C1. According to Mr. Anderson, Col. Verfurth never replied to the request for an accounting of Ms. Jumper's assets.

October 2001 marked another important moment in the saga. One day that month, Mr. Anderson allegedly learned that Ms. Jumper's legs and buttocks were covered with reddish-black bruises and that she had become incontinent during the night. Mr. Anderson blamed the incident on Col. Verfurth and his family because, as Mr. Anderson explained, "they were the ones who were disbursing, releasing money from Sally's funds, and in my opinion they should have been more diligent in seeing that her needs were taken care of." Mr. Anderson acknowledged that "by that time [he] was not on the best of terms" with

Col. Verfurth. That was an understatement.

On October 18, 2001, Mr. Anderson wrote a colorful letter to Col. Verfurth, viciously attacking him for his treatment of Ms. Jumper. After recounting the bruises and the incontinence incident, Mr. Anderson accused Col. Verfurth of embezzling money from Ms. Jumper. "I understand that the other day," Mr. Anderson wrote, "your buddy Linda Thompson [the person in charge of paying Ms. Jumper's bills and handling her monthly expenses] presented Sal with a check made out to you." Mr. Anderson continued: "I hope it [*i.e.*, the check] will help finance your next vacation, Mr. Verfurth." After pointing out that he did "not charge Sally Jumper ANYTHING" for the countless things that he brought her, Mr. Anderson concluded: "I am fully aware that you really do not give a s..t about any of these things, but while you are burning in Hell, I would like you to reflect on why you are there." (editing in original).

### D. Mr. Anderson files a guardianship petition.

So things stood until May 2002, when Mr. Anderson—still with no evidence of any wrongdoing on Col. Verfurth's part—hired attorney William Rogers. Mr. Rogers testified that he asked Mr. Anderson for all documents that Mr. Anderson had concerning Sally Jumper, but that the only document that Mr. Anderson showed him

Notably, on August 27, 2001, that is, ten days after Col. Verfurth received the letter seeking an accounting of Ms. Jumper's assets, Ms. Jumper executed another Durable Limited Power of Attorney. This Durable Limited Power of Attorney differed in two respects from the Durable Limited Power of Attorney that was executed on October 6, 1995, and that had been in effect when Mr. Anderson's lawyer wrote to Col. Verfurth. Most importantly, the 2001 Durable Limited Power of

Attorney provided that it became effective only after two "physicians regularly attending" Ms. Jumper had certified that she was "incapable of handling [her] personal and financial affairs." The 1995 Durable Limited Power of Attorney, in contrast, was effective "immediately." In addition, although the 2001 version retained Mr. Anderson as the primary attorney-in-fact, it made Col. Verfurth the alternate attorney-in-fact, not Mr. Cohen, as the 1995 version had provided.

was a "general power of attorney with a durable provision" from April 1995. Mr. Rogers further testified that he thought that that document gave Mr. Anderson "a general power ... to act on [Ms. Jumper's] behalf," that is "[f]ull power and authority to sell, buy, trade, and on and on and on." The only document in the record from April 1995, however, is a medical power of attorney that gave Mr. Anderson authority "to make decisions about [Ms. Jumper's] medical care if there ever [came] a time when [she could not] make these decisions [herself]." *See also supra,* note 5. And at any rate, the power of attorney that Mr. Anderson gave Mr. Rogers had limited practical force—in Mr. Rogers' view, that power of attorney "wasn't truly operative, because it required two physicians, one being the attending physician, to declare [Ms. Jumper] to be incompetent," and that had not happened.

Mr. Rogers testified that prior to proceeding further, he spoke with Nancy Ludewig (a friend of Ms. Jumper's), Mamie Boyd (later, the court-appointed visitor for Ms. Jumper), and twice with Ms. Jumper's doctor, Marta Schneider. According to Mr. Rogers, Dr. Schneider told him that Ms. Jumper was "lucid part of the time but not consistently lucid." Mr. Rogers did not speak with Ms. Jumper to determine whether she wanted a guardian appointed for her, and made no independent effort to determine whether she had counsel.

Feeling that Col. Verfurth was "stonewalling" Mr. Anderson and that another letter demanding an accounting would be a waste of Mr. Rogers' time and Mr. Anderson's money, Mr. Rogers suggested that Mr. Anderson consider having himself appointed as guardian for Ms. Jumper. Mr. Anderson agreed. Accordingly, on June 18, 2002, Mr. Rogers filed in the Probate Division of the Superior Court a verified Petition in which Mr. Anderson sought to have himself appointed as Ms. Jumper's guardian and conservator.

The Petition alleged that Mr. Anderson was entitled to serve as Ms. Jumper's guardian and conservator because he was "her closest and oldest friend." Mr. Anderson also alleged that he was filing the Petition because of Ms. Jumper's "lack of consistent lucidity and comprehension of her situation," and added that Ms. Jumper was "totally blind." In a blank in the Petition that asks about "[a]ny counsel to the subject known to petitioner," Mr. Rogers wrote "unknown (but almost certainly NONE)." As the concrete reasons for why a conservator should be appointed, Mr. Rogers checked the following two boxes: (1) "the subject of the proceeding has property that will be wasted or dissipated unless property management is provided"; and (2) "money is needed for the support, care and welfare of the subject." After receiving the Petition, the trial court appointed Fiona Druy as Examiner, *see* D.C.Code §§ 21–2041(d) and 21–2054(a) (2001); Mamie Boyd as Visitor, *see* D.C.Code § 21–2033(c); and Sheryl Ellison as Counsel for Ms. Jumper, *see* D.C.Code § 21–2033(b).

Ms. Ellison's Response to the Petition painted a markedly different portrait of Ms. Jumper than the Petition. Asked about Mr. Anderson's attempt to become her guardian, Ms. Ellison quoted Ms. Jumper as saying: "he (Allen) has a nerve to apply for this petition." According to Ms. Ellison, "Ms. Jumper stated that Allen Anderson is *not* her oldest and closest friend; that Jean Howard is." (Emphasis added.) Accordingly, Ms. Jumper indicated that if someone had to be "responsible for her in the event she was not ... able to do so herself, she stated that she would like for Jean Howard to handle her affairs." Ms. Jumper "was very clear that

she did not want Mr. Anderson to be involved." Ms. Ellison also reported that Ms. Jumper told Ms. Boyd, the court-appointed visitor and a woman who had known Ms. Jumper for approximately six years, that "she did *not* want [Mr. Anderson] to be appointed as her guardian." Finally, Ms. Ellison reported that Mr. Anderson had admitted to her that he filed the Petition "despite [Ms. Jumper's] objections because he want[ed] what [was] best for Ms. Jumper and [did] not want anyone to take advantage of her."

Ms. Ellison believed Ms. Jumper "to be well taken care [of] and secure in her surroundings," and reported that during their meeting, Ms. Jumper "was alert, and appeared to comprehend the nature of the proceedings." Although she had "no specific knowledge of her portfolio," Ms. Jumper referred to Col. Verfurth as her "broker." But according to Ms. Ellison, Ms. Jumper's caretakers at the nursing home where she was staying said that Ms. Jumper had various medical conditions and that she required care and oversight. Consequently, Ms. Ellison concluded that "[a]n appointment of a permanent general guardian and a general conservator ... to provide continuing care and supervision would be in the best interest of Ms. Jumper."

Fiona Druy, the court-appointed examiner, also concluded, similarly to Ms. Ellison, that it "appear[ed] that Miss Jumper require[d] the appointment of a guardian and conservator to ensure that all her daily needs may be continued to be met in the most appropriate living environment for her overall safety and well being." Like Ms. Ellison, Ms. Druy found Ms. Jumper to be "neat and clean," as well as "alert" and generally pleasant. But mentally, according to Ms. Druy, Ms. Jumper was not in great shape, being "oriented to self and place only."

On August 1, 2002, the trial court held a hearing on the Petition. Mr. Rogers has conceded that by the day of this hearing he knew about, and indeed had talked to, Ms. Kincaid, who was Ms. Jumper's estate-planning attorney in 2001. Mr. Rogers also has acknowledged that on the day before the hearing, he received from Ms. Ellison (Ms. Jumper's court-appointed counsel) a report that included a letter from Ms. Kincaid. Ms. Kincaid's letter advised that she had represented Ms. Jumper since 1995, and that she had prepared for Ms. Jumper a slew of documents, including a will, a trust, a revocable trust agreement, a durable limited power of attorney, a durable medical power of attorney, and an advance directive. Ms. Kincaid also wrote that over the years Ms. Jumper had modified the initial estate-planning documents. Crucially, Ms. Kincaid wrote: "At this time, all of the planning arrangements continue in effect. In the event that Miss Jumper is no longer able to handle her financial affairs or make her own medical decisions, appropriate arrangements have already been made, and individuals appointed, to address these matters on Miss Jumper's behalf." Mr. Rogers testified that he was "pretty sure" that he read Ms. Kincaid's letter prior to the hearing, but nonetheless he did not bring to the court's attention any of the documents referred to in that letter. Mr. Rogers claims that he thought that it was for Ms. Kincaid, who was present at the hearing, to present those documents to the court.

After a brief hearing, the trial court appointed Mr. Anderson as Ms. Jumper's guardian. The court ruled, however, that Mr. Anderson could not serve as Ms. Jumper's conservator because he was not a member of the bar. Therefore, the court appointed appellee Andrea Sloan (an attor-

ney who happened to be in the courtroom at the time) as the conservator.

### E. Ms. Sloan seeks to vacate the conservatorship order.

On September 10, 2002, a little over a month after the court appointed Mr. Anderson to serve as Ms. Jumper's guardian, Ms. Sloan filed an emergency petition to vacate the order appointing her as conservator. In that emergency filing, Ms. Sloan complained that when she wrote to Col. Verfurth in her capacity as conservator, Col. Verfurth told her that "the 'compliance officer' for Morgan Stanley [Col. Verfurth's former employer] did not recognize the validity of the Letters of Conservatorship, or the authority of the Conservator." Ms. Sloan added that Col. Verfurth, "at the direction of the compliance officer, refused to provide any documentation whatsoever regarding the Sally A. Jumper Trust" and that Col. Verfurth "declined to release any funds to [Ms. Sloan] from the Morgan Stanley holdings of the Sally A. Jumper Trust, which contains nearly 100 per cent of her assets." Ms. Sloan wrote that she needed $18,000 from the trust by September 18, 2002, to pay Ms. Jumper's nursing home fees, and stated that without those funds, she would "not have sufficient funds to pay for this reasonable, customary and absolutely necessary care for Sally Jumper." In the emergency motion, Ms. Sloan also advised the court that after the hearing she learned for the first time that Ms. Jumper had executed over the years certain estate-planning documents, including the 1995 and 2001 documents described above.

Ms. Sloan's emergency motion sought four areas of relief. *First,* Ms. Sloan asked that the court appoint a psychiatrist as an Examiner to meet with and evaluate Ms. Jumper. *Second,* Ms. Sloan sought "a determination from [the trial court] as to the validity of either the Sally A. Jumper Trust dated January 12, 2001 or the Sally A. Jumper Trust dated October 6, 1995 and a determination of which, if any, of the Powers of Attorney are valid." *Third,* Ms. Sloan wrote that in the event that the trial court found that "the Sally A. Jumper Trust, together with the Powers of Attorney executed by Sally Jumper on any given date are valid and the need for a Conservator is obviated, then [Ms. Sloan] respectfully requests that this Court vacate the appointment of a Conservator ... and determine the proper person to be a Successor Trustee for Sally Jumper." *Fourth,* Ms. Sloan wrote that, if the court determined that a conservator was needed after all, then she asked for a "specific order appointing her as Successor Trustee of the Sally A. Jumper Trust ... so that she may access the urgently needed funds for the care, and maintenance and support of Sally A. Jumper."

### F. Mr. Anderson's reaction to Ms. Sloan's motion.

After Ms. Sloan filed the emergency motion, Mr. Anderson wrote a series of e-mails to various persons including Ms. Sloan and Mr. Rogers in which he complained that Col. Verfurth had taken advantage of Ms. Jumper and in which Mr. Anderson expressed a desire to nullify Ms. Jumper's 2001 estate-planning documents:

- In a September 14, 2002 e-mail, with the subject line of "Enough Already!", Mr. Anderson wrote to Mr. Rogers that he had become tempted to ask Mr. Rogers "about the wisdom (and possibility) of ... petitioning the Court to permit [Mr. Anderson] to withdraw as Guardian for Sally Jumper and to name Andrea Sloan as both Conservator and Guardian." Mr. Anderson complained that he was "afraid" that Ms. Jumper had been taken advantage of "starting in 1995,

at least" and that he was frustrated by the "sorry tale [of] duplicity, deceit, greed and behind the scenes machinations." Mr. Anderson wrote that he had "already told one person [Col. Verfurth] that while he is burning in Hell, [Mr. Anderson] want[ed] him to know he is there . . . . for eternity." (Ellipsis in original.) Apparently feeling that the afterlife was not enough, Mr. Anderson wrote: "But he should also start to pay HERE, in this life," before signing off, enigmatically, "Shalom."

- On September 15, 2002, Mr. Anderson wrote that "[e]ven on the surface," the 2001 documents "smell." Mr. Anderson felt that Col. Verfurth and his family (whom Mr. Anderson blamed because they had witnessed some of Ms. Jumper's 2001 documents) had "railroad[ed] Sally Jumper" and that Col. Verfurth was "the SOB" who had the 2001 Trust altered against Mr. Anderson's interests.

- On September 16, 2002, Mr. Anderson wrote that he was suspicious of the 2001 documents and that those documents had to be "challenged, in court, and overturned." The e-mail went on: "But more than anything else, Verfurth simply HAS to be dealt with . . . . he is a son of a bitch . . . for what he and his family did to Sally" (ellipses in original); indeed, Mr. Anderson felt that Col. Verfurth's conduct "border[ed]" on "the criminal." The solution, Mr. Anderson felt, was "to pick up some rocks and see what kind of Verfurth vermin has been crawling under them." Mr. Anderson concluded his e-mail: "Now, do you believe what I have been saying about him? ?"

- On September 21, 2002, Mr. Anderson wrote: "My little pea-sized brain thinks that THE way to go is to have the 2001 documents declared void. . . . Sally's dementia started at least in 1999 and maybe far before." (Ellipsis in original.) Feeling that he had been "had" by Col. Verfurth, Mr. Anderson concluded: "If Sally Jumper's being manipulated and 'used' by all four (4) of the Verfurths is not blatant enough fraud, then tell me what is . . . don't you lawyers have a favorite phrase . . . . 'res ipsa loquitur.' " (Ellipses in original.)

- On September 22, 2002, Mr. Anderson wondered whether there was "any real possibility that what Verfurth has so expertly done can be undone?" Mr. Anderson assured Mr. Rogers that he was "NOT motivated by [Col. Verfurth's] having effectively cut [Mr. Anderson] out of the provisions Sally had made" for Mr. Anderson. That said, Mr. Anderson wrote (to Mr. Rogers, with Ms. Sloan copied) that he could not stand being "bested" by Col. Verfurth—"he who deserves the worst." "The pussilanimous efforts of the THREE of us," Mr. Anderson wrote with an air of resignation, "have in no way been able to counter his malevolent . . . but successful . . . moves. Maybe the smartest thing we can do is fold our tents and slowly fade away . . . a la Douglas MacArthur." (Ellipses in original.)

### G. The court's appointment of a doctor to examine Ms. Jumper, and Mr. Anderson's response.

On September 24, 2002, taking up Ms. Sloan's suggestion, the trial court appointed an Examiner, Dr. Lawrence Sack, to evaluate Ms. Jumper. The court wrote that an Examiner was necessary "for two reasons." "First," the court wrote that it had to know for purposes of the guardianship proceeding whether "in her present condition" Ms. Jumper had "the capacity

to make and communicate financial decisions and to manage her estate." Second, the court wished to understand whether Ms. Jumper had the mental capacity to execute the 2001 estate-planning documents. In the order appointing Dr. Sack, the court observed that although Mr. Anderson disputed the validity of the 2001 documents, Mr. Anderson had "no objection to stipulation to [the] validity" of the 2001 documents provided that "Ms. Sloan was appointed Successor Trustee to the Sally Jumper Trust."

After the trial court appointed Dr. Sack, Mr. Anderson wrote additional impassioned e-mails (again, to Mr. Rogers, Ms. Sloan, and others) expressing his concern that Col. Verfurth caused Mr. Anderson to lose out on his share of Ms. Jumper's estate:

- On October 4, 2002, Mr. Anderson wrote that although he did not care whether the 2001 Trust or the 1995 Trust were deemed operative, he did "not relish kissing goodbye to the 40% of her estate that Sal originally had for me in her earlier undoctored trust, before Verfurth cut me out." "Would either of you," Mr. Anderson asked Mr. Rogers and Ms. Sloan, "sit quietly by and let such a benefit to YOU vanish? ?" Mr. Anderson lamented further: "I could use that as part of the entrance fee to Riderwood Village retirement home." Given his interest in Ms. Jumper's money, and "[i]rrespective of the outcome of the present mess," Mr. Anderson wrote that he "want[ed] to challenge in some court, if not Judge Lopez [the judge presiding over the guardianship proceedings]," then the aspect of the 2001 Trust that placed Mr. Anderson's share of Ms. Jumper's estate under the discretion of Col. Verfurth. Indeed, Mr. Anderson felt that he

"would be a simpleton if [he] were to let the 2001 papers go unchallenged."

- On October 7, 2002, Mr. Anderson wrote: "I would rather deal with Lucifer than Verfurth." Col. Verfurth, according to Mr. Anderson, was "arrogant, conceited, opinionated and devious to the nth degree." Again disclaiming his desire to be guardian, Mr. Anderson wrote that he wished Ms. Sloan to assume that task.

- In an October 8, 2002, e-mail, Mr. Anderson fumed, "[t]his is really dealing with the devil and his female handmaidens." Mr. Anderson was frustrated that Ms. Sloan had asked him to make available Ms. Jumper's estate-planning documents to Ms. Ellison, Ms. Jumper's court-appointed attorney in the guardianship proceeding, and Ms. Kincaid, the attorney who represented Ms. Jumper in connection with the 2001 documents. Because Mr. Anderson felt that he had done all the hard work in tracking down those documents, he wrote that "[t]elling [him] now to share the papers with Kincaid is like telling a police investigator to share his findings with the criminal he is pursuing."

- On October 18, 2002, concerned about what sort of report the "waffling" Dr. Sack would produce, Mr. Anderson suggested that he and Mr. Rogers submit a competing report. Specifically, Mr. Anderson contemplated a document from Ms. Jumper's physician that would attest that Ms. Jumper had dementia as early as December 1998, which would give grounds for overturning the 2001 Trust. Mr. Anderson urged Mr. Rogers, "I think we would be missing out on a golden opportunity if we do not take this initiative. . . . .we stand to lose a lot." (Ellipsis in original.)

## H. The trial court vacates the guardianship and the conservatorship; the parties react.

On October 24, 2002, the court held a hearing to consider Dr. Sack's findings, which turned out to be favorable with regard to Ms. Jumper's ability to conduct her affairs. Dr. Sack testified that when he met with Ms. Jumper, she was "oriented as to time, place and person" and that she "was able to answer [Dr. Sack's] questions rather logically." Dr. Sack talked with Ms. Jumper "at length" about the guardianship proceeding, and Ms. Jumper told Dr. Sack "about the people who were involved in her care and dealing with her monetary affairs." Based on his examination, Dr. Sack concluded that Ms. Jumper "was competent to make wise decisions with the help of other people. She was very good at enrolling other people to aid her and help her and she spoke highly of their aid." Dr. Sack reported that Ms. Jumper's "main irritation or complaint," about which Ms. Jumper had "strong feelings," was that Ms. Jumper "felt that she was being quote, controlled, unquote" by Mr. Anderson.[7]

Given Dr. Sack's positive findings about Ms. Jumper, and observing that "[n]o evidence controverting Dr. Sack's testimony was presented regarding Ms. Jumper's competency," on October 28, 2002, the court vacated Mr. Anderson's appointment as Guardian and Ms. Sloan's appointment as Conservator. The court found that "Sally Jumper ha[d] the present competency to make decisions regarding her medical affairs and financial affairs including the ability to appoint persons to assist her with these matters; and that Sally Jumper has created the Sally A. Jumper Trust encompassing the whole of her present and future estate."

Then things got really interesting. Ms. Kincaid, the attorney who advised Ms. Jumper in connection with the 2001 Trust, testified that several days after the court affirmed that Ms. Jumper was competent, Ms. Jumper sought completely to disinherit Mr. Anderson. According to Ms. Kincaid, Ms. Jumper "was very angry with Allen and that he had caused this big mess and she was very upset about all that had happened because of it and all the people that [were] suddenly involved in her life." Ms. Jumper was frustrated by "new people coming in and out and asking her questions, and was angry about the whole situation and she said that she just didn't want ... Allen to have anything." So, per Ms. Jumper's wishes, Ms. Kincaid prepared additional documents, the "primary purpose" of which was to "essentially eliminate a provision in favor of Allen Anderson," as well as to "put Colonel Verfurth on as a joint trustee with her at that time." Ms. Kincaid testified that Col. Verfurth had "no involvement in the preparation of [those] documents."

In the meantime, although they were unaware of the latest documents that Ms. Jumper had executed, Mr. Rogers and Mr. Anderson were not standing by quietly. Mr. Rogers felt that Dr. Sack's investigation of Ms. Jumper was, to put it mildly, deficient. Mr. Rogers testified about Dr.

---

7. At the hearing, Ms. Sloan also complained that Mr. Anderson wrongfully had sold "a number" of Ms. Jumper's assets. Neither Mr. Anderson nor Mr. Rogers contested this accusation, and the trial court eventually required, as part of the order vacating the guardianship, Mr. Anderson to provide a written accounting to Ms. Sloan of several items belonging to Ms. Jumper that Mr. Anderson controlled. The order also directed Mr. Anderson to "immediately return to Sally Jumper any property belonging to her or to her Trust in his possession including, but not limited to, clothing, papers and other personal property."

Sack: "I think he was a, I don't want to use the word 'quack,' but he obviously was incompetent." Mr. Rogers, however, decided that no further judicial measures would be fruitful, and chose not to seek reconsideration of the order vacating the guardianship.

Instead, Mr. Rogers and Mr. Anderson decided to undo the 2001 documents by going to Ms. Jumper directly, recording each of the meetings on audio tape. Thus, a few weeks after the trial court vacated Mr. Anderson's guardianship, with the case still open only for the trial court to consider fee petitions from the various persons appointed in connection with the matter, Mr. Anderson met with Ms. Jumper. According to Mr. Anderson, Ms. Jumper told him that she was not represented by Ms. Kincaid's firm. Professing that he sought to be "satisfied that [Ms. Jumper's] wishes were being followed," Mr. Anderson phoned Mr. Rogers. Mr. Rogers prepared a legal document that Mr. Anderson and Mr. Rogers took to a meeting with Ms. Jumper. It appears that the document that Mr. Rogers brought to that meeting was a "Statement of SALLY JUMPER"; the Statement purported to reinstate the 1995 Trust (complete with the 40% distribution of her estate to Mr. Anderson). On February 1, 2003, and February 7 (or 8), 2003, Mr. Anderson and Mr. Rogers met with Ms. Jumper again. At those meetings, Messrs. Anderson and Rogers presented for Ms. Jumper's signature additional legal documents that Mr. Rogers prepared and that altered the designation of the trustee for Ms. Jumper.

On February 14, 2003—approximately three and one-half months after the guardianship was vacated—Mr. Rogers, following a suggestion that Mr. Anderson gave in his email of February 3, noticed a deposition of Dr. Schneider, Ms. Jumper's physician. Col. Verfurth's attorney wrote to

Dr. Schneider that she could not be deposed because Ms. Jumper had not waived the confidentiality of her medical records. Dr. Schneider in turn wrote to Mr. Rogers that she would not participate in a deposition unless a subpoena were issued forcing her to do so.

## I. The sanctions proceedings.

On June 13, 2003, frustrated by the attempts of Messrs. Anderson and Rogers to undo the 2001 Trust, Ms. Sloan filed a motion seeking sanctions under Super. Ct. Civ. R. 11 against Mr. Anderson and Mr. Rogers. Ms. Sloan argued that sanctions were appropriate because (1) Messrs. Anderson and Rogers filed the guardianship petition without coming clean to the court about the existence of documents providing for Ms. Jumper's care; and (2) after the filing, and particularly after the guardianship was vacated, Messrs. Anderson and Rogers acted inappropriately by, among other things, inducing Ms. Jumper to sign documents intended to undo the 2001 Trust.

After three days of hearings, the trial court granted monetary sanctions (more on the precise amount later) against Mr. Anderson and Mr. Rogers. Messrs. Anderson and Rogers appealed, and this court reversed the award, holding that sanctions under Rule 11 were unavailable "due to non-compliance with the Rule's 'safe harbor' provision." *In re Jumper,* 909 A.2d 173, 174 (D.C.2006). This court noted, however, that sanctions may be awarded in certain circumstances pursuant to the court's inherent authority, and remanded to determine whether such an award was justified. *Id.*

On remand, in an order dated July 1, 2008, the trial court, this time acting under its inherent authority, reinstated the sanctions award. The trial court found that "Anderson was impelled by animus and/or

ulterior motives to initiate the guardianship proceedings, and that in turn caused the [appellants] to employ unjustified tactics to gain control over Jumper's estate documents, and drive up the cost of attorneys fees in this case." As the trial court saw it, Mr. Anderson was subsumed by animus and ulterior motives from the outset because Mr. Anderson had been "disinherited from the 2001 estate documents that replaced the 1995 documents which gave Verfuth [*sic*] full discretion over Anderson's inheritance" and because "Anderson did not trust Verfurth which the Court, again, infers developed into animus." The court faulted appellants for alleging in the Petition—in the absence of any evidence of wrongdoing on Col. Verfurth's part—that Ms. Jumper's assets were being dissipated or wasted. After the Petition was filed, the trial court found it inexcusable, and indeed "ethically questionable," for Mr. Rogers and Mr. Anderson to "commandeer[ ]" Ms. Jumper's estate documents and to initiate meetings with her without apprising Ms. Kincaid, Ms. Jumper's attorney, or Ms. Sloan. In addition, the court found that Mr. Rogers' attempt to take Dr. Schneider's deposition was an unjustified procedural maneuver that was in derogation of the rules; although the court did not specify which rule it had in mind, discovery in "any proceeding filed under the District of Columbia Guardianship, Protective Proceedings, and Durable Power of Attorney Act of 1986 . . . may be had only upon order of the Court," Super. Ct. Prob. R. 312, but Mr. Rogers never sought or obtained such an order. Finally, the court found dubious appellants' argument that Ms. Jumper was "not mentally competent and . . . vulnerable to the suggestions of anyone—anyone, but" themselves.

As sanctions for appellants' conduct, the trial court awarded Ms. Sloan $19,350.04, for which sum, the court held, appellants were jointly and severally liable. The amount of sanctions represents Ms. Sloan's attorneys' fees incurred after February 15, 2003—fees that the trial court found were incurred "as a result of the efforts by [appellants] going beyond the order of the Court to attempt the execution of a new estate plan."

On July 8, 2008, the trial court issued an Amended Order stating that in addition to being liable to Ms. Sloan, appellants also were jointly and severally liable to Mr. Gazzola, Col. Verfurth's lawyer, in the amount of $25,745.58. (In its various writings on this matter, the trial court interchangeably stated that the award would go to Mr. Gazzola or his law firm, Quinn, Racusin & Gazzola, Chartered. For clarity's sake, we shall refer to Mr. Gazzola as the recipient of this award.) The July 8 Order does not itself explain how the trial court arrived at the $25,745.58 figure, but it is clear that the amount derives from a fee petition that Mr. Gazzola filed in March 2004. According to that fee petition, Mr. Gazzola incurred $25,745.58 in fees and expenses beginning in 2003 in fighting Ms. Ellison's fee petition and in litigating the sanctions issue.

Messrs. Anderson and Rogers then appealed to this court, which appeals we consolidated for purposes of argument and decision. After they filed their opening briefs, Mr. Gazzola filed a "Motion for Leave to Withdraw as Party," claiming that he was "not a necessary party for the adjudication" of the appeals and that Col. Verfurth had "elected not to participate" in the appeals. We granted Mr. Gazzola's motion. Mr. Gazzola's "withdrawal" motion, however, does not make clear whether he is repudiating the award of sanctions in his favor, nor, as we shall explain below, are we able to tell from the trial court's July 8 Order the basis for the trial court's award to him. Accordingly, our opinion will discuss that aspect of the order notwithstanding Mr. Gazzola's "withdrawal" motion.

## II. Discussion

### A. Standard of review.

■ "We recognize that when determining whether sanctions are warranted, the trial court is better situated than the court of appeals to marshal the pertinent facts and apply the fact-dependent legal standard. Our appellate review is correspondingly limited: the predicate finding of bad faith *vel non* is a factual one which we review under the clearly erroneous standard, and the decision to award fees will be reversed only for abuse of discretion. Our review of the trial court's ultimate decision to [award] attorneys' fees is therefore confined to a determination of whether the trial court failed to consider a relevant factor, whether it relied upon an improper factor, and whether the reasons given reasonably support the conclusion." *Jung v. Jung*, 844 A.2d 1099, 1108–09 (D.C.2004) (quotation marks, citations, and editing omitted).

### B. Legal principles.

■ "The District of Columbia applies the general principles of the 'American rule' on attorneys' fees," which provides that "a prevailing litigant ordinarily may not recover attorneys' fees from the defeated party when a case is concluded." *Jung*, 844 A.2d at 1107. The generally stated rationales for the American Rule are that "one should not be penalized for merely defending or prosecuting a lawsuit, and that the poor might be unjustly discouraged from instituting actions to vindicate their rights if the penalty for losing included the fees of their opponents' counsel." *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974) (quotation marks omitted). The American Rule also has the advantage of avoiding costly litigation about the issue of attorneys' fees. *Id.* Furthermore, having each side bear its own fees works to quell "the possibility of a threat being posed to the principle of independent advocacy by having the earnings of the attorney flow from the pen of the judge before whom he argues." *Id.; see also Synanon Found., Inc. v. Bernstein*, 517 A.2d 28, 36 (D.C.1986).

Although it has its advantages, the "American Rule has come under repeated criticism over the years" because there is "some force to the argument that a party who must bear the costs of his attorneys' fees out of his recovery is not made whole." *F.D. Rich Co.*, 417 U.S. at 128 & n. 15, 94 S.Ct. 2157; *see also id.* at 128–29, 94 S.Ct. 2157 (noting that critics have asked, " 'On what principle of justice can a plaintiff wrongfully run down on a public highway recover his doctor's bill but not his lawyer's bill?' "). As "Judge Learned Hand once stated ... 'as a litigant, I should dread a lawsuit beyond almost anything else short of sickness and death,' " *McCandless v. Great Atlantic & Pacific Tea Co.*, 697 F.2d 198, 201 (7th Cir.1983), and having to foot one's own legal bill adds injury to insult. *See id.* ("Defending any lawsuit, even one totally devoid of merit, and even though short of *Jarndyce* proportions, can be an expensive and time consuming process.").

■ "To relieve the American rule of its potential rigor, courts and legislatures have fashioned certain exceptions in which the prevailing party is allowed to recoup reasonable attorneys' fees from the loser." *Synanon Found., Inc.*, 517 A.2d at 36. Under the "bad faith exception to the American rule"—the exception involved in this case—a court may "award attorneys' fees to the prevailing party if the defeated opponent acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Jung*, 844 A.2d at 1107. The sanctioned party's "bad faith conduct" in such a case "must be so egregious that fee shifting

becomes warranted as a matter of equity." *Id.* We have cautioned that "[j]udicial circumspection in awarding attorneys' fees under the bad faith exception is necessary to safeguard a litigant's right of access to the courts." *Id.* at 1108. On the other hand, a trial court has discretion to award attorneys' fees where a party has proven that "extraordinary circumstances or dominating requirements of fairness" demand that it be paid its attorneys' fees as a sanction for its adversary's bad-faith litigation. *Id.* "[A] finding of bad faith must be supported by clear and convincing evidence." *Fischer v. Flax,* 816 A.2d 1, 12 (D.C.2003).

 "Bad faith may be found either in the initiation of a frivolous claim or in the manner in which a properly filed claim is subsequently litigated. To ascertain whether a litigant has initiated an action in bad faith the court examines whether the claim is entirely without color *and* has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons. . . . A party's bad faith in the maintenance of a colorable action, on the other hand, may manifest itself through procedural maneuvers lacking justification or for an improper purpose, such as harassment or delay." *Jung,* 844 A.2d at 1108 (quotation marks and citations omitted).

### C. Analysis.

As described above, the trial court awarded sanctions to Ms. Sloan and Mr. Gazzola, Col. Verfurth's counsel. We affirm the portion of the order awarding fees to Ms. Sloan, but vacate and remand the portion of the order awarding fees to Mr. Gazzola.

### 1. Ms. Sloan's award.

As for the award to Ms. Sloan, we affirm the award of sanctions against both appel-lants. To give a brief preview, we are troubled by appellants' decision to institute the guardianship proceedings, but we do not decide whether the filing of the Petition was sanctionable in and of itself. We are satisfied, however, that appellants' post-filing conduct justifies the sanctions award to Ms. Sloan. And because Ms. Sloan incurred the fees that serve as the basis for the award long after the appellants engaged in sanctionable conduct, we affirm. *See Breezevale Ltd. v. Dickinson,* 879 A.2d 957, 968 (D.C.2005) (where sanctions award is based on bad faith in maintaining, not filing, an action, " 'an award of attorneys' fees should be limited to those expenses reasonably incurred to meet the other party's groundless, bad faith procedural moves' ") (quoting *Synanon Found., Inc.,* 517 A.2d at 38–39).

### a. Mr. Rogers.

 Mr. Rogers does not argue that the trial court erred by vacating the guardianship. He contends nonetheless that his pre-filing conduct was not sanctionable because before filing the petition, he spoke with Mr. Anderson and several others who knew Ms. Jumper, all of whom allegedly agreed that she needed someone to look after her affairs. "How can the proceeding I initiated be branded as 'meritless,' " Mr. Rogers asks, when people close to Ms. Jumper, and even Ms. Ellison, the court-appointed counsel for Ms. Jumper, agreed that a guardianship for her was proper?

As the trial court observed, however, the problem was not simply the filing of the Petition, but some of the representations made therein. Particularly problematic was Mr. Rogers' checking off a box alleging that Ms. Jumper had "property that [would] be wasted or dissipated unless property management [was] provided." Mr. Rogers argued that he checked this box merely to convey his concern for the

disposition of Ms. Jumper's assets. The trial court found, however, that Mr. Rogers' excuse was a poor one because neither Mr. Anderson nor Mr. Rogers ever had any evidence of any wrongdoing on Col. Verfurth's part. There is no reason to believe that the trial court's assessment of the evidence was deficient, much less that it was clearly erroneous. And Mr. Rogers fails to cite any authority for his apparent view that it is permissible to file what inevitably turns into a costly (both financially and emotionally) guardianship petition simply to conduct a fishing expedition into potential misconduct by others.

Also problematic was Mr. Rogers' failure to advise the court at the first hearing on the Petition that Ms. Jumper had counsel (Ms. Kincaid), and that Ms. Jumper, with Ms. Kincaid's assistance, had executed a number of estate-planning documents. As described above, Mr. Rogers conceded that on the day before the hearing he received Ms. Kincaid's letter in which Ms. Kincaid wrote that she was Ms. Jumper's attorney. Further, the letter, which Mr. Rogers was "pretty sure" he read before the hearing, explicitly stated that "all of [Ms. Jumper's] planning arrangements [were] in effect," and that "[i]n the event that Miss Jumper is no longer able to handle her financial affairs or make her own medical decisions, appropriate arrangements have already been made, and individuals appointed, to address these matters on Miss Jumper's behalf." D.C. Rule of Professional Conduct 3.3(a)(1) states that "[a] lawyer shall not knowingly ... fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." When he filed the Petition, Mr. Rogers indicated that Ms. Jumper "almost certainly" was not represented by counsel. Rule 3.3(a)(1) required Mr. Rogers to correct that surely material misstatement, but he did not. Although this omission technically speaking came after Mr. Rogers filed the Petition, because it occurred before the first hearing on the Petition, one might plausibly argue that this conduct should be considered in determining whether Mr. Rogers "initiated [the] action in bad faith." *Jung,* 844 A.2d at 1108.[8]

We need not decide, however, whether Mr. Rogers initiated the Petition in bad faith so as to justify sanctions because the trial court plainly did not abuse its discretion in holding that Mr. Rogers' post-filing conduct was sanctionable. It is elementary that "[d]uring the course of representing a client, a lawyer shall not communicate or cause another to communicate about the subject of the representation with a person known to be represented by another lawyer in the matter, unless the lawyer has the prior consent of the lawyer representing such other person or is authorized by law or a court order to do so." D.C. Rule of Professional Conduct 4.2(a).

---

**8.** Mr. Rogers also claims, citing no authority, that sanctions for pre-filing conduct are the province of Rule 11 alone. Our earlier decision in this case—by reversing the award of sanctions under Rule 11 but remanding for a determination of whether sanctions were justified under the court's inherent authority—rejected that argument. *See In re Jumper,* 909 A.2d at 174. And at any rate, other cases recognize that Rule 11 is not the sole source of authority for a trial court's award of sanctions, including attorneys' fees, for pre-filing conduct. *See, e.g., Jemison v. Nat'l Baptist Convention, USA, Inc.,* 720 A.2d 275, 287 (D.C.1998) (trial court's error in awarding sanctions under Rule 11 was harmless because trial court "also found that [the sanctioned parties] had acted in bad faith," and trial court "exercised its inherent authority-well founded in the case law ...-to punish bad faith litigation"); *see also Chambers v. NASCO, Inc.,* 501 U.S. 32, 50, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (district court did not abuse its discretion "in resorting to the inherent power" even though it "could have employed Rule 11" to sanction a litigant).

Even if Mr. Rogers did not know when he filed the Petition that Ms. Kincaid represented Ms. Jumper in connection with the 2001 Trust, he clearly should have become aware of that fact on the day before the hearing when Ms. Ellison forwarded to him a letter from Ms. Kincaid describing Ms. Kincaid's representation of Ms. Jumper. At the latest, Mr. Rogers must have become aware that Ms. Kincaid was Ms. Jumper's lawyer by September 2002, when Ms. Sloan disclosed the existence of the 2001 Trust in her emergency petition. Yet even after the guardianship was vacated, Mr. Rogers drafted legal documents for Ms. Jumper and participated in tape-recorded meetings with her, all without inviting Ms. Kincaid or any of the attorneys who had represented Ms. Jumper over the years. The trial court did not abuse its discretion in holding that this was sanctionable.

Mr. Rogers readily admits preparing the documents and meeting with Ms. Jumper. Mr. Rogers claims, however, that there was nothing wrong with his doing so because at the meetings he identified himself as Mr. Anderson's attorney, and Ms. Jumper allegedly denied having an attorney. Assuming for the sake of argument that Ms. Jumper was unrepresented,[9] that does not help Mr. Rogers. D.C. Rule of Professional Conduct 4.3(a)(1) states that "[i]n dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not . . . [g]ive advice to the unrepresented person other than the advice to secure counsel, if the interests of

such person are or have a reasonable possibility of being in conflict with the interests of the lawyer's client." The rationale for the rule is that "[a]n unrepresented person, particularly one not experienced in dealing with legal matters, might assume that a lawyer will provide disinterested advice concerning the law even when the lawyer represents a client." *Id.*, cmt. [1]. Accordingly, "[i]n dealing personally with any unrepresented third party on behalf of the lawyer's client, a lawyer must take great care not to exploit these assumptions." *Id.* The rule and its rationale are tailor-made for this case.

Ms. Jumper was on record as being frustrated by Mr. Anderson's involvement in the Petition. What is more, the documents that Mr. Rogers prepared for Ms. Jumper's signature were intended to benefit Mr. Anderson by giving to him Ms. Jumper's assets. As a result, it is clear as day that when Mr. Rogers met with Ms. Jumper and discussed the proceedings, there was at least a "reasonable possibility" that Ms. Jumper's interests would conflict with Mr. Anderson's interests. Whether Mr. Rogers should be disciplined under the Rules of Professional Conduct is a decision for the Office of Bar Counsel to consider in the first instance. For the purposes of this case, however, especially because Ms. Jumper by Mr. Rogers' own assertion was in such a frail state that she needed a guardian and conservator, the trial court was well within its discretion in holding that Mr. Rogers' actions warranted sanctions.[10]

---

**9.** It is far from clear that the assumption is warranted because Ms. Kincaid testified that she remained Ms. Jumper's attorney as of the dates of the meetings between Ms. Jumper and Mr. Rogers.

**10.** Mr. Rogers also argues—again, without citing any authority—that "activities of an attorney outside the courtroom and unconnected to litigation cannot be the subject of

sanctions." This contention is demonstrably false. To begin with, when he met with Ms. Jumper, the guardianship case was still open, and the very raison d'être of the meetings was to reverse the order vacating the guardianship—that is why Mr. Rogers provided a copy of the tape recordings of those meetings to the court. Thus, even though Mr. Rogers met with Ms. Jumper outside of court, the meet-

Finally, we see no basis for disturbing the trial court's conclusion that Mr. Rogers engaged in an unjustified maneuver that he undertook in bad faith when he noticed a deposition of Dr. Schneider, Ms. Jumper's personal physician. Under Super. Ct. Prob. R. 312, discovery in the guardianship petition that Mr. Rogers filed could be "had only upon order of the Court." Mr. Rogers did not seek or obtain such an order when, in February 2003—long after the merits of the guardianship petition were concluded—he sent to Dr. Schneider a notice stating that he was going to take her deposition "for possible use at trial." The trial court's holding that this maneuver was in "derogation of the rules," and thus further justified sanctions, was not an abuse of discretion.[11]

### b. Mr. Anderson.

 "Oh what a tangled web we weave, when first we practice to deceive," Mr. Anderson, quoting Sir Walter Scott,[12] wrote of Col. Verfurth on September 9, 2002–that is, one day before Ms. Sloan moved to vacate the guardianship. Unfortunately for Mr. Anderson, the trial court found that he, not Col. Verfurth, was the one who was "impelled" by ulterior mo-

tives. On appeal, Mr. Anderson argues that the sanctions award was erroneous because (1) throughout the litigation Mr. Anderson merely followed the advice of his counsel; and (2) Mr. Anderson was motivated by his concern for Ms. Jumper, not because of animus toward Col. Verfurth or anyone else. We find neither argument persuasive.

As with Mr. Rogers, although we ultimately rest our holding on Mr. Anderson's post-filing conduct, we begin by noting that Mr. Anderson's decision to file the Petition itself tests the boundaries of what is sanctionable. Although Mr. Anderson claimed that Ms. Jumper was taken "advantage" of beginning in 1995 and had begun to develop dementia in 1998 or 1999, he points to nothing that he did at those times to protect Ms. Jumper. Yet a mere six weeks after the 2001 Trust gave Col. Verfurth discretion over how to disburse Ms. Jumper's assets to Mr. Anderson, Mr. Anderson suddenly became alarmed, and started to document Ms. Jumper's supposed deterioration and his corresponding anger toward Col. Verfurth. Mr. Anderson's anger escalated, without any objective support,[13] until he filed the

---

ings plainly were connected to the litigation regarding the guardianship. Moreover, courts have rejected the view that "a court may sanction only conduct occurring in its presence." *Chambers, supra* note 7, 501 U.S. at 57, 111 S.Ct. 2123 ("As long as a party receives an appropriate hearing, as did Chambers, the party may be sanctioned for abuses of process occurring beyond the courtroom.") (citation omitted); *see also Jemison, supra* note 7, 720 A.2d at 287 ("a court may ... impose sanctions (albeit not under Rule 11) when it finds that the attorney or party has engaged in bad faith litigation, even if that person has not signed any court papers").

**11.** Mr. Rogers' defense that throughout he was "simply acting as [Mr. Anderson's] attorney" does not pass muster. As the Seventh Circuit has said, quoting Elihu Root, " 'about half of the practice of a decent lawyer is

telling would-be clients that they are damned fools and should stop.' " *McCandless,* 697 F.2d at 201–02 (editing omitted); *see also id.* at 202 ("refus[ing] to accept the notion that counsel may shift responsibility for a frivolous suit to his client").

**12.** For variations on the spelling and punctuation of this famous quote, *see Marboah v. Ackerman,* 877 A.2d 1052, 1053 n. 2 (D.C. 2005), and *Illas v. Przybyla,* 850 A.2d 937, 939 n. 1 (R.I.2004).

**13.** Mr. Anderson's protestations to the contrary notwithstanding, it is difficult to see why the 2001 Trust's treatment of Mr. Anderson was anything but reasonable. To be sure, unlike the 1995 Trust, the 2001 Trust did not give Mr. Anderson a lump sum amounting to 40% of Ms. Jumper's estate. The 2001 Trust,

Petition. The Petition, however, made no mention either of the 2001 documents, or even of the estate-planning documents that Mr. Anderson knew had been "re-written." [14] On these facts, one might conclude that Mr. Anderson initiated the lawsuit in bad faith—*i.e.*, that he filed a frivolous claim for improper reasons, *see Jung*, 844 A.2d at 1108, and that in failing to advise the court at the outset of *any* of the estate-planning documents, Mr. Anderson worked a fraud on the court. *See Fischer*, 816 A.2d at 13. Likewise, one easily could argue that sanctioning Mr. Anderson for his decision to file the Petition would not implicate the American Rule's concerns that litigants not be chilled from accessing the courts and that the poor not be discouraged from vindicating their rights. *See F.D. Rich Co.*, 417 U.S. at 129, 94 S.Ct. 2157.

Again, however, although we are troubled by Mr. Anderson's decision to file the Petition, we rest our affirmance on his post-filing conduct. As we have explained above, Mr. Rogers' and Mr. Anderson's attempts to undo the 2001 Trust were improper. Mr. Anderson contends that he is a lay person who was merely following his lawyer's advice, and that the sins of his lawyer should not be visited upon him. But the fact that Mr. Anderson is a lay person does not insulate him from sanctions. *See, e.g., Breezevale Ltd.*, 879 A.2d

at 967; *Fischer*, 816 A.2d at 4, 12; *Jemison, supra* note 7, 720 A.2d at 282–83. Moreover, the record reveals that Mr. Anderson was not a mere bystander to Mr. Rogers' misconduct. Instead, Mr. Anderson was the one who repeatedly met with Ms. Jumper and gave her documents that Mr. Rogers had drafted. Mr. Anderson also suggested to Mr. Rogers that Mr. Rogers attempt to get a statement from Ms. Jumper's doctor attesting to Ms. Jumper's supposed incompetence. Thus, the trial court did not abuse its discretion in rejecting Mr. Anderson's excuse that he was merely following the advice of his counsel. *See Chambers, supra* note 7, 501 U.S. at 41, 111 S.Ct. 2123 (affirming sanctions award where district court rejected a litigant's argument "that he had merely followed the advice of counsel," and found instead that litigant was " 'strategist' " behind lawsuit); *Jemison*, 720 A.2d at 283 (affirming sanctions award against a *non-party* lay person who "was deeply involved in the fraudulent scheme [that warranted sanctions] from the very beginning").

Even without reference to Mr. Rogers' conduct, Mr. Anderson's own words and deeds support the trial court's finding that he was acting in bad faith. Giving Mr. Anderson the benefit of the doubt, one can assume for the sake of argument that when he filed the Petition, Mr. Anderson

---

however, did contemplate that the Trustee would take good care of Mr. Anderson during his life, even though the Trustee had discretion in how to accomplish that goal. After Mr. Anderson's passing, the Trustee was to distribute the remainder of the funds to various charities, including Ms. Jumper's alma mater, Connecticut College—which likewise seems reflective of Ms. Jumper's wishes. In short, the evidence in the record does not support Mr. Anderson's view that the 2001 Trust must have been brought about through improper means.

**14.** Mr. Anderson claims that he did not know of the change made by the 2001 Trust until September 2002, but approximately one month after the 2001 Trust was executed Mr. Anderson wrote a letter to Mr. Cohen in which he "question[ed] [Ms. Jumper's] mental competence to have had all her documents re-written." Further, clearly suggesting that Mr. Anderson knew of some specific changes that had been made, Mr. Anderson wrote to Mr. Cohen: "I find it interesting that you too were not aware she had re-done her papers. .... especially since you are the back-up trustee .... or were." (Ellipses in original.)

did not know of the contents of any estate-planning documents and that he simply wanted to ensure that his long-time friend Ms. Jumper was in good hands. After Mr. Anderson filed the Petition, however, his concerns should have been alleviated. The court-appointed attorney and examiner for Ms. Jumper both found that Ms. Jumper's nursing home was providing her with good care. Nobody who met with Ms. Jumper reported any trouble with her finances, much less, as Mr. Anderson suggested, that her assets were being wasted. And to the extent that Mr. Anderson needed any reminder, there soon emerged the 1995 and 2001 estate-planning documents, which showed that Ms. Jumper had carefully documented her wishes for her care.

Mr. Anderson's reaction to these developments is striking for how much he focused on his own interests, and how little on Ms. Jumper's. For instance, Mr. Anderson did not view the trial court's appointment of Dr. Sack to determine whether Ms. Jumper had the mental capacity to execute the 2001 documents as a sensible measure that would help to determine Ms. Jumper's wishes. Instead, Dr. Sack's involvement troubled Mr. Anderson, not because he thought that Ms. Jumper's well-being was at risk, but because Mr. Anderson did "not relish kissing goodbye to the 40% of her estate that Sal originally had for [him] in her earlier undoctored trust." (Mr. Anderson, as will be recalled, thought that he could have used the forty percent share that he thought was coming his way after Ms. Jumper died to finance his entry to a retirement home of his own.) Indeed, even before Dr. Sack returned his report finding that Ms. Jumper was competent to execute the 2001 documents, Mr. Anderson was already contemplating a challenge to the provision in the 2001 Trust giving Col. Verfurth discretion of the funds set aside for Mr. Anderson—Mr. Anderson thought that "he would be a

simpleton if [he] were to let the 2001 papers go unchallenged." Then, in the days leading up to the hearing, Mr. Anderson wrote that he feared that Dr. Sack was "waffling," and that his findings would not be favorable to him. In response to this perceived threat, Mr. Anderson proposed that he and Mr. Rogers submit a competing report that would attest that Ms. Jumper had dementia as early as 1998, which would provide grounds for overturning the 2001 Trust. Mr. Anderson explained: "I think we would be missing out on a golden opportunity if we do not take this initiative. . . . . we stand to lose a lot." (Ellipsis in original.)

Eventually, Mr. Anderson's fears materialized. On October 24, 2002, after finding that the existing documents adequately provided for Ms. Jumper's care, the trial court vacated the guardianship and conservatorship. Given that Mr. Anderson continued to claim that he was *not* interested in Ms. Jumper's money, and the fact that he has never argued that the trial court erred by vacating the guardianship, one might have expected at that point that the matter would come to a close. It did not.

Instead, his disclaimer of an interest in Ms. Jumper's assets notwithstanding, Mr. Anderson attempted almost immediately to reinstate Ms. Jumper's 1995 Trust. He did so even though restoring the 1995 Trust would have no tangible benefit for Ms. Jumper (though it would reward him handsomely). Mr. Anderson did not invite Col. Verfurth (whom he had accused, without any basis, of embezzling money from Ms. Jumper, and had called, among other things, "vermin") or Ms. Kincaid (whom he had compared to a "criminal") to the meetings he had with Ms. Jumper. This shows that Mr. Anderson acted in bad faith because after the trial court affirmed the validity of the 2001 documents, it became established as a matter of law that Col.

Verfurth and Ms. Kincaid were Ms. Jumper's valid representatives. Mr. Anderson's failure to invite Ms. Sloan to his meetings with Ms. Jumper also weighs against him because Mr. Anderson previously trusted Ms. Sloan enough to suggest that she become Ms. Jumper's guardian; if Mr. Anderson were truly interested in Ms. Jumper's well-being, why not alert Ms. Sloan to what he was doing? Furthermore, as the trial court observed, even after Ms. Jumper signed the new documents that Mr. Anderson gave her, despite Mr. Anderson's "concern for the proper administration of [Ms.] Jumper's finances and care, no person authorized by the newly created estate documents acted on behalf of [Ms.] Jumper to pay the bills, provide for necessary care and support, or manage her financial affairs." On these facts, the trial court's decision that Mr. Anderson's conduct was so "egregious that fee shifting [was] warranted as a matter of equity," *Jung,* 844 A.2d at 1107, was not an abuse of discretion.

Mr. Anderson concedes that he "clearly had animus for Col. Verfurth," but argues that he acted at all times not because of that animus, but out of his concern for Ms. Jumper. As we have said, "[t]he truth is that litigation often is brought for a host of reasons, and with varying degrees of animus and vehemence." *Jung,* 844 A.2d at 1112. So Mr. Anderson may well have been motivated by, among other things, an earnest, albeit unfounded, belief that Col. Verfurth had exerted undue influence over Ms. Jumper. But even if that were true, the trial court was entitled to make the finding that Mr. Anderson's "ulterior motives," not any desire to help Ms. Jumper, "subsume[d] the litigation," *id.,* and that sanctions, therefore, were appropriate. As we have held in the criminal context (where the standard of proof and the stakes are higher than in this case), "where there are two permissible views of

the evidence, the factfinder's choice between them cannot be clearly erroneous." *See Dunn v. United States,* 976 A.2d 217, 220 (D.C.2009) (quotation marks omitted). Here, even if there were conflicting evidence regarding Mr. Anderson's motivation, the trial court did not clearly err in making "the predicate finding of bad faith *vel non,*" and it did not abuse its discretion in awarding sanctions. *Jung,* 844 A.2d at 1108 (quotation marks omitted).

### 2. Mr. Gazzola's award.

■ Unfortunately, because we cannot discern from the record the trial court's rationale for awarding sanctions to Mr. Gazzola, we must vacate that portion of the order and remand the case to the trial court for further proceedings. In so doing, we note that in 2004, when the sanctions litigation was still proceeding under the Rule 11 framework, the trial court at first held open the possibility that Mr. Gazzola's fees would come from Ms. Jumper's estate—on the condition, that is, that Mr. Gazzola could show that he provided a benefit to Ms. Jumper's estate. After reviewing Mr. Gazzola's fee petition, however, the trial court found that Mr. Gazzola had not provided any services benefitting Ms. Jumper. The trial court also found, somewhat paradoxically, that Mr. Gazzola's services "were reasonable and necessary in order to reach[ ] the final results," though the court did not explain which "results" it had in mind. Ultimately, the court ruled that Mr. Gazzola's fees would have to come from Messrs. Anderson and Rogers, not Ms. Jumper's estate.

After remand, the trial court reinstated the sanctions award, but it did not explain why it was awarding sanctions to Mr. Gazzola. Indeed, in its July 1, 2008, Order, the trial court ruled that Mr. Gazzola was not entitled to sanctions at all. Without elaboration, however, the July 8, 2008, Or-

der provided that Messrs. Anderson and Rogers were required to pay Mr. Gazzola $25,745.58. Although this amount plainly derives from Mr. Gazzola's March 2004 fee petition, the July 8, 2008, Order itself does not explain how the trial court arrived at the conclusion that Mr. Gazzola was entitled to the award. Nor does the July 8 Order distinguish between the amount of the award intended to sanction appellants for their pre-, as opposed to their post-filing conduct. As explained above, and in *Jung*, 844 A.2d at 1108, the distinction is crucial because when the court imposes sanctions under its inherent authority, the determination of both liability and the amount of sanctions may vary depending on whether the conduct at issue is the initiation of a frivolous lawsuit or the manner in which the suit is subsequently litigated. Further, although sanctions awarded pursuant to Rule 11 and sanctions awarded under the trial court's inherent authority may overlap in terms of the conduct that they address, *see supra*, note 7, the trial court's determination that Mr. Gazzola was entitled to fees under Rule 11 does not necessarily justify an award of sanctions under the court's inherent authority. *See Jumper I*, 909 A.2d at 176–77.

Because the trial court's silence as to these issues precludes us from being able to conduct a meaningful review of that portion of the July 8, 2008 Order awarding fees to Mr. Gazzola, we must vacate that portion of that Order and remand for further proceedings. *See Johnson v. United States*, 398 A.2d 354 (D.C.1979) ("Just as a trial court's action is an abuse of discretion if no valid reason is given or can be discerned for it, so also it is an abuse if the stated reasons do not rest upon a specific factual predicate.") (citation omitted). On remand, the trial court should determine, first, whether Mr. Gazzola has waived his interest in sanctions by withdrawing as a party from the appeals in this court, and, if he did not, the basis and the amount of Mr. Gazzola's award, if any.

### III. Conclusion

The portion of the July 8, 2008, Order of the trial court awarding sanctions to Ms. Sloan is affirmed. The portion of the July 8, 2008, Order awarding sanctions to Mr. Gazzola is vacated and remanded for further proceedings consistent with this opinion. Finally, we direct the Clerk of this court to forward a copy of this opinion to the District of Columbia Office of Bar Counsel. *See Synanon Found., Inc.*, 517 A.2d at 44 n. 11.

*So ordered.*